# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON COLLURA,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS JAMES FORD et al.,** | : | **No. 13-4066** |
| *Defendants.* | : | |

# R E D A C T E D   M E M O R A N D U M   O P I N I O N [1]

PRATTER, J.                                                          FEBRUARY 3, 2016

Jason Collura brings 42 U.S.C. § 1983 claims against Nicholas James Ford, Mary Politano, Steffen Boyd, Steven Austin, Charles Hoyt, and Robert Malvesuto ("Defendants" or "Probation Officer Defendants") for alleged violation of his due process, First Amendment, and Fourth Amendment rights, as well as several incidental state law claims. In the absence of timely responses to Mr. Collura's Complaint, the Clerk of Court entered default against the Defendants and in favor of Mr. Collura.[2]

---

[1] This redacted memorandum opinion is issued consistent with the Court's Order granting the Plaintiff's motion to redact a section of the Court' July 14, 2014 Memorandum Opinion (Doc. No. 67). Other than this redaction, no other changes have been made to the Court's prior Memorandum Opinion.

[2] Mr. Collura also sued the City of Philadelphia ("City") and the state court judge who sentenced him. The Court dismissed these claims earlier in this litigation. Those rulings can be found among the following collection of all the orders in this case: Sept. 23, 2013 Order (Docket No. 6) (claims against the City dismissed with prejudice); Oct. 15, 2013 Order (Docket No. 8) (reconsideration denied); Dec. 17, 2013 Order (Docket No. 15) (Federal Rule of Civil Procedure 54(b) certification of judgment against Mr. Collura and in favor of the City); Jan. 17, 2014 Order (Docket No. 30) (reconsideration denied; claims against judge dismissed); Jan. 27, 2014 Order (Docket No. 31) (order for supplemental briefing); Feb. 10, 2014 Order (Docket No. 37) (reconsideration denied; default judgment issues clarified; motion to disqualify opposing counsel denied; Mr. Collura warned against using inappropriate language) Mar. 28, 2014 Order (Docket No. 47) (reconsideration and other motions denied; order for supplemental briefing); Apr. 14, 2014 Order (Docket No. 51) (permitting filing under seal). The March 28, 2014 Order provides the fullest prior account of the factual and legal issues in this case.

The central issue now before the Court is whether to set aside the Clerk's entry of default. The parties have, in effect, cross-moved on the issue: after the entry of default, the Probation Officer Defendants appeared and moved to set aside the entry of default (Docket No. 18). Mr. Collura subsequently filed a Motion for Default Judgment (Docket No. 21). He later filed a Motion for Full or Partial Judgment on the Pleadings (Docket No. 58).

For the reasons set forth below, the Court lifts the entry of default and denies Mr. Collura's Motion for Default Judgment and Motion for Judgment on the Pleadings. The Court also strikes several of the "affirmative defenses" in Defendants' Amended Proposed Answer with instructions to file an accordingly modified Answer.

Finally, the Court resolves several other pending motions filed by Mr. Collura that seek reconsideration and, potentially, recusal; disqualification of opposing counsel; the striking of sealed defense exhibits; and an ECF account.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Court lays out the facts of this case according to the differing perspectives of Mr. Collura and the Probation Officer Defendants before describing the relevant phases of the case's procedural history. The lengthy recitations appear here because of the role that factual assertions have in the considerations the Court must balance in the context of several of the pending motions.[3]

---

[3] For purposes of the default/default judgment stage, the Court, in recounting the parties' differing versions of events, accepts well-pleaded factual allegations as true and draws all reasonable inferences in the pleader's favor. *E.g.*, *Joe Hand Promotions, Inc. v. Yakubets*, --- F. Supp. 2d ----, ----, No. 12-4583, 2014 WL 960787, at *4 (E.D. Pa. Mar. 11, 2014) ("As at the motion to dismiss stage, the court accepts as true the well-pleaded factual allegations in the plaintiff's complaint, except those relating to damages, as though they were admitted or established by proof." (default judgment motion)); *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 869-70 (3d Cir. 1984) ("In considering whether a claim or defense appears to be meritorious for this inquiry, we do not purport to use summary judgment standards. A claim, or

### A.    Mr. Collura's Version of Events[4]

At his scheduled April 12, 2012 probation meeting, Mr. Collura discovered that he had a new probation officer, Defendant Nicholas Ford, who "start[ed] giving attitude to [Mr. Collura] from virtually second one" and then got "more and more abrasive and demanding," at which point Mr. Collura responded, that "there was no issue" with his "coming in today" and that "he knows probation law" and "his rights will not be violated." Compl. ¶ 13. Mr. Ford allegedly replied, "ok you wanna be smart, here you have a urine (drug test)." Compl. ¶ 13. Mr. Collura objected.

Not happy that Mr. Collura was "sticking up for himself," Mr. Ford told Mr. Collura that his reporting time, which previously was every two months, would now be weekly. Compl. ¶ 13. The two then began to argue, and Mr. Ford eventually told Mr. Collura that he was "going to have [Collura] locked up," Compl. ¶ 13, and that Mr. Collura was "going to be stuck with" Mr. Ford, who would "give [Mr. Collura] a unit evaluation and . . . hit [him] with conditions" that Mr. Collura would be unable to meet and thus "wind up not reporting," with the end result of "incarceration for non-compliance," Compl. ¶ 14, at 14. Mr. Collura replied that this threatened

---

defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense." (motion to set aside default)); *infra* Part II.

[4] Mindful of the admonition that it must hold pro se litigants to "less stringent standards" than lawyers, *McDowell v. Del. State Police*, 88 F.3d 188, 189 (3d Cir. 1996) (citation omitted), and that "[t]he obligation to liberally construe a *pro se* litigant's pleadings is well-established," *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011), the Court has carefully attempted to parse Mr. Collura's allegations and claims against the Probation Officer Defendants specifically. Although the shotgun-style pleading, *see, e.g.*, Compl. ¶ 2, makes this task difficult, the Court has nonetheless, of course, attempted to construe Mr. Collura's Complaint liberally in his favor. *See also, e.g.*, *Henry v. Moore*, 500 F. App'x. 115, 117 (3d Cir. 2012); *Mala v. Crown Bay Marina*, Inc., 704 F.3d 239, 244 (3d Cir. 2013). Based on this review, the Court concludes that Mr. Collura appears to level the following allegations against the Probation Officer Defendants in particular.

evaluation "would come up in a negative result," at which point Mr. Ford retorted that a CJC[5] doctor would perform the evaluation in such manner that Mr. Collura "would not get out of the unit" by subjecting Mr. Collura to a catch-22: "if your doctor gives you a positive result, then you [are still in the unit], but if he doesn't then you [are still in the unit]." Compl. ¶ 14.

Mr. Collura, who had earlier demanded to speak with a supervisor, protested that this situation was unfair "because the eval has to be fair if it is taken." Compl. ¶ 14. Steffan Boyd, a supervisor, arrived and listened to Mr. Collura's account of "Ford's behavior" but did "nothing at all, except change the report time from Ford's 1 week to 1 month." Compl. ¶ 14. Mr. Ford then informed Mr. Collura that Mr. Ford would email the judge for an evaluation date and order. Mr. Collura asked for at least 20 days['] notice and notified Mr. Ford that he would be filing a complaint regarding their conversation, including, specifically, "the illogical eval demand." Compl. ¶ 14, at 15. Mr. Collura "then took the drug screening in the building and passed." Compl. ¶ 14, at 15.

Later that day, Mr. Collura called Mr. Boyd and left a message "to file a grievance about" (1) Mr. "Ford and his disturbing behavior including threatening to lock [Mr. Collura up] for a bogus reason"; (2) Mr. Collura's demand for a change of probation officers; (3) the change in his reporting frequency; and (4) "the evaluation situation." Compl. ¶ 15. Mr. "Boyd did nothing." Compl. ¶ 15.

Mr. Collura reported again on May 10, 2012. Compl. ¶ 16. Mr. Ford told Mr. Collura that no judge had responded to Mr. Ford's email regarding scheduling an evaluation, and Mr. Collura again requested 20 days' notice. Mr. Ford again refused to entertain Mr. Collura's complaints about the evaluation in general, or about Mr. Collura's reporting frequency. Mr. Ford gave Mr. Collura another drug test, which Mr. Collura again passed. Compl. ¶ 16.

---

[5] Presumably "Criminal Justice Center."

On May 31, 2012, Mr. Collura attempted to telephone another supervisor, Steven Austin, who did not pick up. Mr. Collura "left a message simply stating his first name and [that] he had important issues that needed to be resolved and left his contact number." Mr. Austin did not call Mr. Collura back. Mr. Collura tried again, unsuccessfully, to reach Mr. Austin on June 11, 2012. Compl. ¶ 17. Mr. Collura "left a message that he had left one earlier that was ignored, has several important issues that need attention, and if he continued to fail to do his job then [Mr. Collura] would go [back] to his supervisor and if needed get a lawyer involved." Compl. ¶ 17. Mr. Collura withheld any details or names "because that as for a live conversation," so Mr. "Ford did not know there was a complaint about him being made to Austin." Compl. ¶ 17.

Mr. Collura reported again on June 7, 2012, at which point a different probation officer appeared and told Mr. Collura that Mr. Ford was not in that day and that Mr. "Ford has [Mr. Collura] down for the 12th," notwithstanding that Mr. Collura's "signed card" said June 7. Compl. ¶ 18, at 17. The unidentified probation officer further stated that Mr. Ford "was planning to tell [Mr. Collura] on the 12th about a unit evaluation on the 13th." Compl. ¶ 18, at 17. Mr. Ford then appeared and claimed that there had been a "misunderstanding," and that Mr. Ford "had [Mr. Collura] down for the 13th." Compl. ¶ 18, at 17. Further, Mr. Ford told Mr. Collura that, on May 11, 2012, Mr. Boyd had "set up a date for the evaluation which was June 13th at 12 p.m." Compl. ¶ 18, at 17.

Mr. Collura then asked Mr. Ford if Mr. Ford was planning to tell him "on the 12th at 4:00 p.m. about an evaluation 19 hours later," and Mr. Ford "said yes," thereby confirming, in Mr. Collura's estimation, Mr. Ford's intent to give him only "19 hours['] notice." Compl. ¶ 18, at 17. In fact, Mr. Boyd had given Mr. Ford a form that stated, "I have not contacted the p/p about his appointment. You will need to do that." Compl. ¶ 18, at 17. The meeting ended with Mr. Ford telling Mr. Collura that such evaluations could only be rescheduled once, but, nonetheless,

telling Mr. Collura (1) that the evaluation could not be rescheduled and (2) to call him. Compl. ¶ 18, at 18. Mr. Ford refused to give his email address to Mr. Collura for rescheduling purposes or otherwise. Compl. ¶ 18, at 18.

On June 11, 2012, Mr. Collura called the evaluation unit to confirm whether he had an appointment. Compl. ¶ 19, at 18. Although Mr. Collura knew no one in the evaluation unit, he "expected a problem with [the evaluation]" because of Mr. Boyd's and/or Mr. Ford's involvement. Compl. ¶ 19, at 18. Mr. Collura first spoke with "a clerk," who was "extremely rude, loud, belligerent, [and] said she didn't know anything about scheduling, who does it, how to reschedule, nothing." Compl. ¶ 19, at 18. At his request to speak with a supervisor, Mr. Collura was transferred to Mary Politano, whose supervisor, like Mr. Ford's, was Mr. Boyd. Compl. ¶ 19, at 19. Ms. Politano "picked up where the clerk left off in terms of loudness[,] attitude[,] and rudeness," but eventually informed Mr. Collura that after "trial a probation supervisor can request a unit evaluation," whereas "pre-trial . . . only a judge can." Compl. ¶ 19, at 19.

Mr. Collura attempted, over Ms. Politano's "cut offs and . . . talking," to "explain[] his situation in detail" and "simply request[] to reschedule the evaluation." Compl. ¶ 19, at 19. The two continued to argue about whether Mr. Collura was in fact on the list, and, if so, for which date, and Ms. Politano ultimately told Mr. Collura that she could not do anything to reschedule the appointment, because the probation officers, rather than the evaluation unit, were responsible for scheduling the evaluations. Compl. ¶ 19, at 19-20. The appointment was neither canceled nor rescheduled. Compl. ¶ 19, at 20. The next day, on June 12, 2012, Mr. Collura left a message with Ford regarding how to reschedule the appointment and informing Ford that Mr. Collura would need "at least 20 days' notice." Compl. ¶ 20.

On June 14, 2012, Mr. Austin called Mr. Collura. Compl. ¶ 22, at 20. The call quickly devolved into an argument when Mr. Collura attempted to explain his grievances and Mr. Austin persisted in asking, instead, "why [Mr. Collura] was complaining to him." Compl. ¶ 22, at 20-21. The call ended with no resolution. Compl. ¶ 22, at 21. Mr. Austin later called back and "left a message claiming that he was willing to talk if he got his way." Compl. ¶ 22, at 21. Mr. Collura returned this call later the same day and left his own "message detailing the . . . grievance" and "relay[ing] with precision everything above that was told to Boyd, Ford's behavior, a p/o change, a report time rest, correcting the evaluation situation, and more, including a complaint about Boyd who failed to do his job correctly." Compl. ¶ 22, at 21. Because Mr. Austin's voicemail was "set to about 90 seconds," Mr. Collura "had to use more than [one] recording to get the facts, issues, and relief requested" conveyed to Mr. Austin. Compl. ¶ 22, at 21.

On June 15, 2012, Mr. Austin informed Messrs. Ford and Boyd of Mr. Collura's complaints about them. Compl. ¶ 23, at 21. At this point, Mr. Ford "drafted up a bogus warrant request which Boyd signed off on, then emailed to [the judge,] who instantaneously issued a probation violation bench warrant that was one hundred percent retaliation, as there was no violation of probation that occurred." Compl. ¶ 23, at 21. Mr. Collura was unaware of the warrant. Compl. ¶ 24, at 22.

On June 18, 2012, at about 4:00 PM, Mr. Collura saw that Mr. "Ford had just called his phone," and knew that Mr. Ford and Mr. Austin had spoken because "[o]nly Austin was given the number to that phone." Compl. ¶ 24, at 22. Mr. Ford did not leave a message. Compl. ¶ 24, at 22.

On June 19, 2012, Mr. Ford called Mr. Collura about Mr. Collura's "missed appointment" and Mr. Collura's "message that [he] needed to reschedule." Compl. ¶ 25. When Mr. Collura inquired about the "missed appointment," Mr. Ford responded that it was "'[his]

fault' and 'don't worry about it.'" Compl. ¶ 25. Mr. Ford then told Mr. Collura that "he wanted

[Mr. Collura] to come in to get a new evaluation date," but Mr. Collura responded that he had

"no plans to come in before the [next] required time of July 12th, and he needs it in writing to

begin with." Compl. ¶ 25. Mr. "Ford never mentioned the bogus warrant in the conversation."

Compl. ¶ 25.

On June 20, 2012, Mr. Collura "got wind of the warrant[] on his own" and called Mr.

Boyd and left a message "demanding the bogus warrant be removed, the underlying facts, [and]

a p/o change request." Compl. ¶ 26, at 23. Mr. Collura also "did the same with [Mr.] Austin."

Compl. ¶ 26, at 23. Then, in late June, attorney Patrick Link reached out to Mr. Ford, who

"refused to tell [Mr. Link] why the warrant was issued [or] give him a summary sheet [or]

anything in writing," Compl. ¶ 26, at 23., although, apparently, Mr. Ford said that he was "going

to remove the . . . warrant," Compl. ¶ 26, at 24. Further, Mr. Ford spoke to Mr. Link "about an

evaluation date rescheduling" and told Mr. Link that "he wanted [Mr. Link and Mr. Collura] to

come down to the office on Arch [S]treet to take the evaluation." Compl. ¶ 26, at 23-24. To look

further into the evaluation issue, Mr. Collura again spoke to Ms. Politano, who was

"uncooperative." Compl. ¶ 26, at 24.

Mr. Collura and Mr. Link went to meet with Mr. Ford on July 3, 2012, and Mr. Ford

indicated that he would "take the bogus warrant off." Compl. ¶ 27. Mr. Ford then said that he

would "have a new date for the evaluation within 10 days" and that he would notify both Mr.

Collura and Mr. Link in writing. Compl. ¶ 27. Mr. Collura's next reporting date was to be

August 7, 2012. Compl. ¶ 27.

The next time Mr. Collura heard from Mr. Ford, however, was on August 2, 2012, at

about 10:30 AM, when Mr. Collura received in the mail a violation of probation notice ("Gagnon

II Hearing Summary") for a hearing scheduled for August 3, 2012, at 9:00 AM. Compl. ¶ 28.

The mailing date on the envelope was July 30, 2012. Compl. ¶ 28. Mr. Collura received notice only 23 hours before the scheduled hearing, Mr. Collura alleges, notwithstanding the fact that Mr. Ford had had the hearing scheduled on July 3 or July 5, 2012. Compl. ¶ 28.

Mr. Collura managed to reschedule the state court hearing for August 14, 2012. Compl. ¶ 30, at 26. On August 2, 2012, Mr. Collura also "filed a grievance in writing with Deputy Chief Charles Hoyt and Chief Robert Malvesuto" regarding all the events described above. Compl. ¶ 30, at 26. Mr. Collura also unsuccessfully attempted to call Mr. Hoyt. Neither Mr. Hoyt nor Mr. Malvesuto took any action. Compl. ¶ 30, at 26.

On August 7, 2012, Mr. Collura reported as scheduled. When Ford asked him if he had any questions, Mr. Collura replied, "No, you[r] actions speak for themselves." Compl. ¶ 31, at 27. In response, Mr. Ford became angry and yelled, "I'm going to put you in jail" and threatened to call the warrant unit if Mr. Collura left the booth. Mr. Ford refused to give Mr. Collura the hearing summary sheet, and Mr. Boyd, then arriving, asked whether Mr. Collura "wrote a letter to Hoyt." Compl. ¶ 31, at 27. When Mr. Collura "demanded the hearing sheet from [Mr.] Boyd, [Mr. Boyd] said ask for it at the hearing." Compl. ¶ 31, at 27. The meeting ended with Mr. Collura asking for a normal reporting date and Mr. Ford signing Mr. Collura's card to indicate that the next reporting date would be the August 14, 2012 violation of parole hearing. Compl. ¶ 31, at 28.

At the August 14, 2012 hearing, notwithstanding Mr. Ford's protestations that the hearing should proceed, the judge continued the hearing to September 26, 2012, due to an issue with counsel (presumably counsel's need to prepare for the hearing). Compl. ¶ 32. Mr. Collura approached Mr. Ford to ask about his next reporting date, and Mr. Ford signed Mr. Collura's card to indicate that the September 26, 2012 hearing would be Mr. Collura's next reporting date. Compl. ¶ 32.

Mr. Collura describes how Mr. Ford's summary of the events leading up to his alleged violation of probation was false, and how Mr. Ford failed to mention a number of events. *See* Compl. ¶ 33, at 29-31.

On September 26, 2012, when Mr. Collura arrived for his violation of probation hearing, he "was immediately informed it was canceled, [and] the court crier said 'your p/o is mad at you,'" probably because Mr. Collura had appealed his case. Compl. ¶ 34. Mr. Collura called Mr. Ford and left a message, and then waited 90 minutes, but neither Ford nor any other probation officer appeared. Compl. ¶ 34.

On October 10, 2012, Mr. Collura received an "arrest warrant warning" postmarked October 2, 2012, and indicating that it was created on September 28, 2012. Compl. ¶ 35, at 31. The warning stated that Mr. Collura had "failed to report to [his] probation[] officer as required," Compl. ¶ 35, at 31-32, and explained that "[t]he arrest warrant will be issued on October 10, 2012," Compl. ¶ 35, at 32. Mr. Collura then contacted the CJC and ascertained that Mr. Ford had made a warrant request, which was declined, on October 6, 2012. Further, "[t]he standard operating procedure of the probation department is it has to be two missed office visits before any type of action can be requested." Compl. ¶ 35, at 32. When Mr. Collura called Mr. Ford on October 10, 2012, Mr. Ford informed him that Mr. Collura had until October 25, 2012, to come in, but refused to send this message in writing. Compl. ¶ 35, at 32.

When Mr. Collura met with Mr. Ford on October 25, 2012, Mr. Ford told him that he was going to request a violation of probation hearing again. Compl. ¶ 36, at 32. Mr. Ford denied speaking with the court crier and then made Mr. Collura submit urine for another drug test. Compl. ¶ 36, at 32. Mr. Collura claims that this urine test was retaliatory: the process of taking the drug test is unpleasant and time consuming and, further, "if you don't fill [the cup] or can't go to the bathroom, you cannot leave the building." Compl. ¶ 36, at 32-33.

On November 29, 2012, during another probation meeting, Mr. Ford told Mr. Collura that Mr. Ford had put in another request on November 20, 2012, for the violation of probation hearing to be held. Compl. ¶ 37.

When Mr. Collura reported in early January 2013, Mr. Ford, looking "dejected," stated that he had not heard back regarding the status of the violation of probation hearing. Mr. Ford reported the same circumstances in early February 2013. On April 11, 2013, Mr. Ford informed Mr. Collura that "they denied the request for the hearing, because it lacked both merit and also substance in terms of a violation." Compl. ¶ 37. Mr. Ford also "specifically declared that he was not going to request [a violation of probation hearing] any further." Compl. ¶ 37. And, Mr. Collura discovered, after November 20, 2012, Mr. Ford "did not send in another request." Compl. ¶ 37.

Mr. Collura's efforts to contact higher-ups in the FJD in October and November 2012 led nowhere. Compl. ¶ 39. But in March 2013, Mr. Collura managed to reach an individual who stated that he could "handle grievances and that they could address [his]." Compl. ¶ 40, at 34. In late April 2013, Mr. Collura filed an in-depth grievance in writing about the events described above, and on May 6, 2013, in a phone call with the same individual, that individual indicated that the grievance was under investigation. Compl. ¶ 40, at 34.

Then, on May 10, 2013, Mr. Ford again requested a violation of probation hearing, but mentioned nothing to this effect to Mr. Collura when they met on May 16, 2013. *Id.*; *id.* ¶ 38. Mr. Collura contends that Mr. Ford must have been "informed of the grievance most likely by May 8th or 9th . . . and retaliate[d] by May 10th." Compl. ¶ 40, at 35.

*     *     *

Based on these allegations, Mr. Collura initially purported to bring a 42 U.S.C. § 1983 action for violation of his federal constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments, "all of the Federal Constitution," and several Pennsylvania laws, including the Pennsylvania Constitution. Compl. ¶ 2 (Docket No. 1). As described below, and as relevant to the current analysis, the federal claims Mr. Collura continues to press appear to be violation of his procedural due process rights, First Amendment retaliation, and his subjection to urinalysis in violation of the Fourth Amendment.

### B.     The Probation Officer Defendants' Version of Events

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ Amended Proposed Answer (hereinafter "APA") ¶ 12, Supplemental Submission (hereinafter "SS"), Ex. 1. Accordingly, when Mr. Collura pled guilty to the charges against him on November 8, 2005, Presiding Judge Pamela Pryor Dembe of the Philadelphia Court of Common Pleas sentenced him to 11.5 to 23 months' incarceration to be followed by 13 years' probation under the supervision of the Mental Health Unit of the Adult Probation and Parole Department of the First Judicial District of Pennsylvania ("APPD"). Thus, Mr. Collura's "term of probation began on July 4, 2007 and is scheduled to end on July 4, 2020." APA ¶ 12.

In addition to adhering to the Rules of Probation and Parole in the APPD, which "include, *inter alia* . . . reporting to the Probation/Parole Officer as directed; responding promptly to any summons to appear in court; obeying all federal, state, country criminal laws and city ordinances; and prohibition on unlawful possession, use, sale, or distribution of controlled substances of any kind," APA ¶ 12; *see* Rules of Probation and Parole, SS Ex. G, Mr.

Collura was expected to abide by the Policy and Procedure for Mental Health Supervision. The Policy and Procedure further required probationers to submit to "a drug test on the first office visit" and report to their Probation Officers "at a minimum on a monthly basis," which could "be increased based on stability and compliance." APA ¶ 12; *see* Policy and Procedure 2, SS Ex. H. Failure to report to one appointment was to result in "an arrest warning letter" rescheduling the appointment within a week, while the second missed appointment was to result in a warrant. APA ¶ 12. In the first five years of his probationary period, Mr. Collura's reporting times varied among "weekly, bi-weekly, monthly, and bi-monthly" bases. APA ¶ 12.

On April 12, 2012, Mr. Collura met "then-newly-assigned" Probation Officer Nicholas James Ford of the Mental Health Unit of the APPD for their first appointment, throughout which Mr. Collura was "argumentative, non-responsive and confrontational." APA ¶ 13. In response to Mr. Collura's complaint that his assignment to the Mental Health Unit was unwarranted, Mr. Ford proposed that Mr. Collura submit to a mental health evaluation "to determine the . . . status of [Mr. Collura's] mental health," but Mr. Collura, suspecting that "he could be trapped by the evaluation's recommendation," rejected the suggestion. APA ¶ 13. At the end of the meeting, Mr. Ford gave Mr. Collura a urinalysis drug screening to ascertain whether Mr. Collura was refraining from the use of controlled substances in adherence to the Rules of Probation and Parole. The screening tested negative. APA ¶ 13.

After "learning . . . that he was homeless" and "offer[ing] assistance with obtaining housing and support services . . . in accordance with Mental Health Unit policy directing that reporting frequency be increased if a probationer's living situation was unstable," Mr. Ford also scheduled Mr. Collura's next meeting to follow within one week. APA ¶ 13. Upon hearing Mr. Collura's objections to this increased reporting frequency, Steffan Boyd, Mr. Ford's supervisor,

shifted Mr. Collura to a one-month reporting schedule, "the minimum reporting frequency under the Policies and Procedures of the Mental Health Unit." APA ¶ 14.

Later that day (April 12, 2012), Mr. Collura left Mr. Boyd "numerous threatening voicemail messages" complaining about Mr. Ford. Considering the nature of Mr. Collura's "voicemail tirades," Mr. Boyd requested that a mental health evaluation be scheduled for Mr. Collura, whose actions demonstrated potential need for mental health treatment. APA ¶ 15.

Mr. Collura and Mr. Ford next met on or about May 15, 2012. APA ¶ 16. During this appointment, Mr. Ford again explained that if Mr. Collura still objected to his assignment to the Mental Health Unit, he would likely have to undergo a mental health evaluation, although he "would have the opportunity to express his feelings at an upcoming status hearing." APA ¶ 16. Again, Mr. Collura underwent a urinalysis drug screening, in keeping with Mr. Ford's "general practice" of "conduct[ing] random drug screenings" by "request[ing] that probationers take a drug test at several visits in a row." APA ¶ 16.

On both June 1 and June 11, 2012, Mr. Collura left several "angry, threatening and confrontational" voicemail messages for Probation Supervisor Steven Austin. APA ¶ 17. The messages' content was nebulous— Mr. Collura "only stated that he had certain unspecific issues that required resolution," and Mr. Collura never identified himself as the caller. APA ¶ 17.

Mr. Collura appeared as scheduled for a probation meeting on June 7, 2012, at which time he was informed that his mental health evaluation appointment had been scheduled for June 13, 2012, and that he could reschedule this date once. This notification was "in accordance with Mr. Ford's typical practice of notifying probationers . . . between seven and ten days ahead of the scheduled date." APA ¶ 18. Four days later, on or about June 11, Mr. Collura called the Court Mental Health Clinic of the Criminal Justice Center. Throughout the conversation, first with Sheryl Stepner and then with Probation Officer Mary Politano, Mr. Collura expressed

himself in a "verbally abusive, argumentative, and non-responsive" manner. APA ¶ 19. Mr.

Collura also declared his intention not to attend the mental health evaluation, even after Ms.

Politano informed him that it was both "lawful and proper." APA ¶ 19. Indeed, Mr. Collura

subsequently failed to appear for the evaluation. APA ¶ 19. Then, on or about June 14, 2012, Mr.

Collura spoke in a "verbally combative, belligerent, and argumentative" manner on the telephone

with Mr. Austin before "yelling expletives" and hanging up. APA ¶ 22.

On June 15, 2012, as a result of Mr. Collura's failure to report to the June 13 evaluation,

an "Absconder Warrant for Plaintiff's arrest was lawfully and properly requested and issued,"

and Probation Officer Frank Romeo simultaneously drafted a *Gagnon* I Hearing Summary form

explaining the events thought to justify the warrant. APA ¶ 23. That day, and again five days

later, Mr. Collura continued to harass Probation Office employees Austin, Boyd, and Politano

with "rambling" voicemail messages and telephone calls. APA ¶¶ 24, 26.

On June 19, six days after missing his mental health evaluation, Mr. Collura informed

Mr. Ford via voicemail that Mr. Collura had skipped his mental health evaluation because

"something had come up." APA ¶ 25. Although Mr. Ford attempted to convince Mr. Collura to

report in person to the Mental Health Unit in a return phone call on June 20, Mr. Collura refused

to attend any appointment before July 12, 2012. APA ¶ 25. Mr. Ford, complying with office

policy, did not warn Mr. Collura of his outstanding warrant, "so as to avoid creating a flight

risk." APA ¶ 25.

On or about July 3, 2012, Mr. Collura and his attorney, Patrick Link, met with Mr. Ford

in person, and "the warrant for [Mr. Collura's] arrest was promptly removed because [Mr.

Collura] ha[d] resumed reporting." APA ¶ 27. This meeting resulted in an agreement that Mr.

Link would accept service of an upcoming notice rescheduling the mental health evaluation, and

Mr. Collura was told to report for his next probation meeting on August 7, 2012. APA ¶ 27.

On July 26, 2012, Mr. Ford mailed Mr. Collura a "Violation of Probation/Parole Hearing Notification" to inform Mr. Collura of an upcoming status hearing on August 3, 2012. APA ¶ 28. Mr. Ford also informed Mr. Link of the hearing. APA ¶ 28. Subsequently, Mr. Collura requested, and was soon granted, a postponement of the hearing to August 14, 2012. APA ¶ 30. Mr. Collura also contacted Probation Officer Deputy Chief Charles Hoyt by mail to express his discontent with the handling of his probation. APA ¶ 30.

On August 7, 2012, Mr. Collura appeared at his scheduled meeting with Mr. Ford and was given a "Violation of Probation/Parole Hearing Notification" indicating the new date of August 14, 2012, for the status hearing. APA ¶ 31. The following day, Mr. Ford attempted to call Mr. Collura to instruct him on how to obtain a copy of the status hearing summary sheet, only to find that Mr. Collura's phone line had been disconnected. APA ¶ 31. In preparation for the status hearing, the APPD prepared a *Gagnon* II Hearing summary sheet "contain[ing] a true and correct summary of the terms of [Mr. Collura's] probation, and of [his] behavior during his interaction with the Probation Officer Defendants." APA ¶ 33.

"At the request of [Mr. Collura's] counsel," the status hearing was postponed from August 14, 2012, until September 26, 2012, which date was also then set as Mr. Collura's next official reporting date. APA ¶ 32. Although the status hearing was "cancelled by the court without an explanation," Mr. Collura never appeared on September 26, 2012, "either in court or in the APPD offices," to check in with Mr. Ford for his "required probation report." APA ¶ 34. Thus, "in accordance with APPD policy," Mr. Ford sent an Arrest Warrant Warning to Mr. Collura and requested that Mr. Collura contact him by October 10, 2012. APA ¶ 35. After Mr. Collura confirmed his receipt of the warning, Mr. Ford directed him to report in person to a meeting on October 25, 2012. APA ¶ 35.

When Mr. Collura attended the October 25, 2012 meeting, he was "given a drug screening, for the first time since May 2012, to evaluate his continued compliance with the APPD prohibition against using drugs," and told that the inexplicably canceled status hearing would be rescheduled. APA ¶ 36. While the scheduling of a *Gagnon* II status hearing, requested on or about November 20, 2012, was pending, Mr. Collura attended scheduled probation meetings with Mr. Ford from November 2012 through May 2013. APA ¶¶ 37, 38. After Mr. Ford put in another request for a status hearing on May 10, 2013, Mr. Collura was notified on July 18, 2013, that a status hearing was scheduled for July 23, 2013, but the hearing was continued by the court to September 6, 2013, of which Mr. Collura was formally notified on August 22. APA ¶ 37.

At the September 6, 2013 status hearing, "Judge Brown ordered that [Mr. Collura] undergo a mental health evaluation forthwith." APA ¶ 37. The results of the evaluation, conducted on October 9, reported that Mr. Collura neither exhibited any signs of mental illness nor required any treatment. APA ¶ 37. Accordingly, Mr. Collura was transferred out of the Mental Health Unit of the APPD and no longer reports to Mr. Ford. APA ¶ 37.

C.    **Relevant Procedural History**

As laid out in the Court's March 28, 2014 Order (Docket No. 37), on December 17, 2013, Mr. Collura requested entry of default against the individual Defendants by the Clerk of Court pursuant to Federal Rule of Civil Procedure 55(a), and the Clerk entered default (Docket No. 16). Six days later the Probation Officer Defendants moved to set aside the default entered against them (Docket Nos. 18). On December 27, 2013, Mr. Collura moved for default judgment (Docket No. 21) and filed a brief opposing the Probation Officers' Motion to Set Aside Default

(Docket Nos. 23). The Probation Officer Defendants then petitioned on January 14, 2014, for leave to file an untimely answer.

On January 27, 2014, the Court, calling attention to the meritorious defense prong of the standard for setting aside a default, *see, e.g.*, *Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir. 1982), ordered the Defendants to submit a Supplemental Brief in support of their Motion to Set Aside Entry of Default and also invited Mr. Collura to file a Response. Jan. 27, 2014 Order (Docket No. 31). The Court also clarified that "while the Motion to Set Aside Entry of Default remains pending, the Court will hold Mr. Collura's Motion for Default Judgment . . . (Docket No. 21) and Defendants' Petition for Leave to File Answer to Plaintiff's Complaint . . . (Docket No. 27) in abeyance." Jan. 27, 2014 Order ¶ 5.

On March 28, 2014, upon consideration of the Defendants' Supplemental Brief and Mr. Collura's filings in response, the Court explained:

> In deciding whether to set aside a default entered by the clerk of court, a court assesses three factors: (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a complete and meritorious defense to the action; and (3) whether defendant's default was the result of his culpable conduct. The Court finds that the Probation Officer Defendants . . . have satisfied the first and third prongs of this test.

> First: . . . Mr. Collura has pointed to no prejudice other than delay, and the Court has already noted that his argument that default is the only way to vindicate his claims is insufficient as a matter of law. *See* February 10, 2014 Order ¶ 1(b)(ii).

> Third: . . . "[C]ulpable conduct means actions taken willfully or in bad faith." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 123-24 (3d Cir. 1983) As the Defendants have shown . . . , their failure to timely answer Mr. Collura's Complaint resulted from administrative error on the part of the City of Philadelphia Law Department, which provides legal representation to First Judicial District employees upon request, as here. The Defendants' late appearance and Petition for Leave to File Answer were therefore neither willful nor made in bad faith.

> But the second issue remains. As the Defendants note, to show that they have a meritorious defense, they must show that "allegations of [their] answer, if established [at] trial, would constitute a complete defense to the action." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) (quoting *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d [242,] 244 [(3d Cir. 1951)];

citing *Farnese v. Bagnasco*, 687 F.2d at 761, 764 (3d Cir. 1982)). As their briefing suggests, the Defendants have several defenses as a matter of law to Mr. Collura's claims. To the extent that Mr. Collura challenges the *fact* of his probation, that claim is barred by *Heck*, as earlier discussed.[6] But the Court requires more information to evaluate whether a challenge to the conditions of Mr. Collura's probation—such as drug testing—is potentially *Heck*-barred. "Because probation is by its nature less confining than incarceration, the distinction between the fact of confinement and the *conditions* thereof is necessarily blurred." *Drollinger v. Milligan*, 552 F.2d 1220 (7th Cir. 1977). Thus, the primary inquiry is "whether [Mr. Collura's success in challenging the conditions of his probation] would call into question *a state court's judgment*," rather than "only the discretionary decisions of the [Probation] Department." *Thornton v. Brown*, --- F.3d ---, No. 11-56146, 2013 WL 7216368, at *7 (9th Cir. Feb. 18, 2014). Further, while "the spirit of the *Younger* doctrine" appears to bar at least some of Mr. Collura's claims "since he is trying to derail . . . ongoing probation . . . proceeding[s]," *Sarlund v. Anderson*, 205 F.3d 973, 975 (7th Cir. 2000) (citing *Younger v. Harris*, 401 U.S. 37 (1971)), claims for damages are not barred by *Younger* per se, at least in the Third Circuit, *see, e.g.*, *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 811 (3d Cir. 2010).

Other of the defenses the Defendants raise, however, may only be established by evidence or proof at summary judgment or trial, and not as a matter of law this early in the litigation; Defendants concede as much with regard to Mr. Collura's ostensible First Amendment retaliation claim and his claim that the Defendants did not give him notice of violation of probation (or other probation) proceedings. . . . [Defendants'] Proposed Answer, however, only addresses instances of notification (other than the sending of an Arrest Warrant Warning, Proposed Answer ¶ 35), in a conclusory manner. Defendants also say little in their Proposed Answer (other than by way of denial) regarding Mr. Collura's retaliation claims.

Thus, out of fairness to Mr. Collura and in an abundance of caution, given that the Third Circuit Court of Appeals requires a defendant seeking to establish a meritorious defense to allege "specific facts beyond simple denials or conclusionary statements," *$55,518.05 in U.S. Currency*, 728 F.2d at 195, and to the extent that Mr. Collura otherwise has viable federal claims with regard to notice rights and retaliation, the Defendants must be more specific in their Proposed Answer. The Court will thus require the parties to tender Supplemental Submissions . . . .

March 28, 2014 Order 15-18 (footnotes and some citations omitted). This "second issue," and

analysis of the parties' "Supplemental Submissions," is now at issue.

---

[6] Mr. Collura appears no longer to challenge the conditions of his probation or his conviction, *see infra* Part III; note 13 and accompanying text; thus, the Court strikes (without prejudice) Defendants' *Heck* defense from their Proposed Amended Answer, *see infra* note 29 and accompanying text.

At the end of the March 28, 2014 Order, the Court ordered the Defendants to file another Supplemental Submission by April 11, 2014, in which they were to "attach[] those state court documents that imposed and/or indicate the terms of Mr. Collura's sentence; attach an Amended Proposed Answer with more specific allegations . . . ; attach[] any other necessary and/or helpful documentation; *and* otherwise address[] the foregoing issues." March 28, 2014 Order 18-19. The Court also asked Mr. Collura to respond.

The Defendants' effort to set aside the default and Mr. Collura's effort to convert it into a default judgment are now ripe for decision.

## II.    STANDARD OF REVIEW FOR WHETHER TO SET ASIDE A DEFAULT[7]

"An entry of default is a purely ministerial act carried out by a court clerk on request in cases in which a defendant has 'failed to plead or otherwise defend,'" *Sourcecorp Inc. v. Croney*, 412 F. App'x 455, 457 (3d Cir. 2011) (quoting Fed. R. Civ. P. 55(a)), and is not the same as a default judgment. *Joe Hand Promotions, Inc. v. Yakubets*, --- F. Supp. 2d ----, ----, No. 12-4583, 2014 WL 960787, at *4 n.5 (E.D. Pa. Mar. 11, 2014). As the Third Circuit Court of Appeals has explained,

> Defaults[, in addition to default judgments,] are also treated in Rule 55(c), which authorizes a court to "set aside the entry of default" for "good cause shown[.]" There is a distinction between a default standing alone and a default judgment. If a judgment by default has been entered, it may be set aside "in accordance with Rule 60(b)." *Id.* Less substantial grounds may be adequate for setting aside a default than would be required for opening a judgment. Thus, "[a]ny of the reasons sufficient to justify the vacation of a default judgment under Rule 60(b) normally will justify relief from a default entry and in various situations a default entry may be set aside for reasons that would not be enough to open a default judgment." 10 C. Wright & A. Miller, Federal Practice and Procedure § 2696 at 334 (1973).

---

[7] Because the issues of whether to set aside a clerk of court's entry of default and whether to grant a plaintiff's motion for default judgment are two sides of the same coin, the Court focuses here primarily on the former inquiry and reaches an outcome entirely consistent with the latter.

*Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653, 656 (3d Cir. 1982); *see also, e.g.*, *Budget Blinds, Inc. v. White*, 536 F.3d 244, 257 (3d Cir. 2008) ("*Farnese* is concerned with whether to set aside an 'entry of default' as opposed to a 'default judgment.' *See Farnese v. Bagnasco,* 687 F.2d at 763-64 (citing Fed. R. Civ. P. 55(c) (stating that a court may set aside an entry of default 'for good cause'))).").

Defaults entered by the clerk may be set aside upon showing of "good cause." Fed .R. Civ. P. 55(c). The Third Circuit Court of Appeals "has often emphasized that it does not favor defaults, and that in a close case doubts should be resolved in favor of setting aside the default and obtaining a decision on the merits," *Farnese*, 687 F.2d at 764; *accord, e.g.*, *Husain v. Casino Control Comm'n*, 265 F. App'x 130, 133 (3d Cir. 2008) (per curiam) (quoting *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 981 (3d Cir. 1988)), and it has laid out three factors for district courts to consider in arriving at a decision to be reviewed for abuse of discretion: "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious [or litigable] defense; [and] (3) whether the default was the result of the defendant's culpable conduct." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984).[8]

---

[8] For the most part, the case law in the Third Circuit for deciding whether to grant a plaintiff's default judgment motion and whether to set aside a default or default judgment are the same, even if there might be reasons that the considerations under the different postures should be somewhat different. *See, e.g.*, *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 51-52 (3d Cir. 2003) ("Whatever the merits of transposing the *$55,518.05 in U.S. Currency* test to *Chamberlain*'s facts . . . ." (citing *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000))); *id.* at 52-53 (Rendell, J., concurring) ("For instance, it makes little sense for a plaintiff to be required to demonstrate that the defendant does not have meritorious defenses when the defendant has failed to respond. As I see it, a defendant moves to set aside the default judgment because it asserts it has meritorious defenses."). In any case, this view, which, as Judge Rendell articulates in her concurrence in *Hill v. Williamsport Police Department*, places a greater-than-warranted burden on plaintiffs, *see* 69 F. App'x at 52-53, suggests that a defendant's burden can be no greater under the case law specifically addressing motions to set aside default judgments than it is under *Chamberlain*'s requirements for the granting of a default judgment. And, importantly, *Chamberlain* states that default judgment is not appropriate if the defendant (in addition to not having acted culpably and in a way such as to prejudice the plaintiff) has a

(1) **Prejudice.** First, "the prejudice requirement compels plaintiffs to demonstrate that the plaintiff's claim would be materially impaired because of the loss of evidence, an increased potential for fraud or collusion, substantial reliance on the entry of default, or other substantial factors." *Dizzley v. Friends Rehab. Program, Inc.*, 202 F.R.D. 146, 147-48 (E.D. Pa. 2001); *accord Feliciano*, 691 F.2d at 657 ("loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment"). Defaulting defendants also lessen a plaintiff's prejudice when they "move[] to vacate the defaults shortly after their entry." *See Dambach v. United States*, 211 F. App'x 105, 109-10 (3d Cir. 2006) (per curiam).

"Of course, it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent's default. But we do not think that is the sense in which the term 'prejudice' is used in [the default judgment case law]." *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 127 (3d Cir. 1999) (quoting *Pratt v. Philbrook*, 109 F.3d 18, 22 (1st Cir. 1997). In other words, the fact that the plaintiff will have to litigate the case if the court sets the default or default judgment aside does not constitute prejudice. *Sourcecorp*, 412 F. App'x at 459-60 (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987); *Feliciano*, 691 F.2d at 656-57); *Feliciano*, 691 F.2d at 656-57 ("[D]elay in realizing satisfaction on a claim rarely serves to establish [a sufficient] degree of prejudice."). Thus, "the costs associated with continued litigation normally cannot constitute prejudice," *Sourcecorp*, 412 F. App'x at 459-60; *accord Feliciano*, 691 F.2d at 656 (insufficiency of "the financial costs associated with enforcing a judgment later vacated"); nor does "the emotional strain of litigating an action on the merits," *Kelly M. v. Luzerne Intermediate Unit*, 71 F. App'x 116, 118 (3d Cir. 2003). "[P]rejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue." *O'Brien Envtl. Energy*, 188 F.3d at 127; *accord, e.g., Turner v. Corr. Med.*

---

"litigable defense." 210 F.3d at 164. This view is consistent with the case law regarding whether to set aside default judgments.

*Servs., Inc.*, 262 F.R.D. 405, 407-08 (D. Del. 2009). Stated differently, it cannot be "prejudicial" to proceed to do that which one was going to be required to do but for a fortuitous event that occurred completely independent of the party claiming the prejudice.

(2) **Meritorious Defenses.** A defendant "establishe[s] a meritorious defense [if] its allegations, if established at trial, would constitute a complete defense." *$55,518.05 in U.S. Currency*, 728 F.2d at 195. The defendant's allegations must be of "specific facts beyond simple denials or conclusionary statements." *Id.* (citing cases).[9] At the same time, the defenses need only be "litigable," *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000), or "not 'facially unmeritorious,'" *Emcasco*, 834 F.2d at 74 (quoting *Gross*, 700 F.2d at 123); *see also Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 869-70 (3d Cir. 1984) ("In considering whether a claim or defense appears to be meritorious for this inquiry, we do not purport to use summary judgment standards. A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense."); *accord also, e.g.*, *Scholz Design, Inc. v. Costa*, No. 10-1640, 2011 WL 635277, at *5 (W.D. Pa. Feb. 11, 2011) ("Defendant merely has to show that it has a defense to the action which at least has merit on its face."). *See also supra* note 8. A defendant's allegations are sufficient to establish a meritorious defense "if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Keegel v. Key W. & Caribbean Trading Co., Inc.*, 627 F.2d 372, 374 (D.C. Cir. 1980) (internal quotation marks omitted) (citing, inter alia, *Tozer*, 189 F.2d at 244).

Moreover, a "meritorious defense" can be a defense of any variety—whether a dispute of material fact, albeit made out only by sufficiently specific factual allegation; an affirmative

_____

[9] For pertinent observations about the nature of this requirement and the potentially differing interpretations of several courts of appeals, see *Dahl v. Kanawha Inv. Holding Co.*, 161 F.R.D. 673, 684 n.18 (N.D. Iowa 1995).

defense;[10] the contention of failure to state a claim;[11] or lack of subject matter jurisdiction,[12] to name the obvious.

      **(3) Culpable Conduct.** In the context of a defendant's failure to timely answer a plaintiff's complaint, "culpable conduct means actions taken willfully or in bad faith." *Gross*, 700 F.2d at 123-24; *accord Feliciano*, 691 F.2d at 657. "[T]he words 'willfulness' and 'bad

---

    [10] That is, "meritorious defenses" and "affirmative defenses" are not synonymous. To the contrary, "a meritorious defense is presumptively established when the 'allegations of defendant's answer, if established on trial would constitute a complete defense to the action'" because the allegations create a factual dispute. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) (quoting *Tozer*, 189 F.2d at 244); *Tozer*, 189 F.2d at 244 (finding a meritorious defense based on the defendant's allegations establishing that "there is a one hundred eighty degree of disagreement as to the actual terms of [the parties'] agreement"); *Jorden v. Nat'l Guard Bureau*, 877 F.2d 245, 250-51 (3d Cir. 1989) ("[T]here is no doubt that the defendants have evidence which, if accepted, will constitute a complete defense to the case."); *Sourcecorp*, 412 F. App'x at 459-60 ("[W]e think the Croneys' assertions that individual transfers of money were not fraudulent, but rather reasonable payments for services actually rendered, are— barely—sufficient to support a remand."); *see also, e.g.*, *Clarion Bd., Inc. v. Sturrus*, No. 12- 1621, 2013 WL 1149916, at *1 (W.D. Pa. Mar. 19, 2013) ("Here, Defendant's proposed Answer sets forth a complete defense to the Plaintiff's breach of contract and breach of fiduciary duty claims because he has expressly denied that the information contained in the challenged brochure included the confidential and proprietary information of Plaintiff. . . . As such, the Court finds that Defendant has raised both factual and legal defenses to all of Plaintiff's claims in this case and this is enough to satisfy the Third Circuit's light standard on the meritorious defense prong because Defendant is not required to prove his case at this point, but only to present facts which, if proven, would be a full defense to the claims asserted.").

    [11] A court cannot grant default judgment in favor of a plaintiff who fails to state a claim, *see generally, e.g.*, *Joe Hand Promotions, Inc. v. Yakubets*, --- F. Supp. 2d ----, ----, No. 12-4583, 2014 WL 960787, at *1-5 (E.D. Pa. Mar. 11, 2014); consequently, failure to state a claim is also a "meritorious defense," *see, e.g.*, *Dambach*, 211 F. App'x at 109-10 ("Furthermore, Defendants, in essence, had a meritorious defense to the action—one that the District Court would have been obligated to consider *sua sponte* before entering default judgment—the lack of subject-matter jurisdiction."); *Husain*, 265 F. App'x at 132-33 (affirming the district court's dismissal of plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and denial of plaintiff's motion for default judgment); *cf. also, e.g.*, *United States v. Alsol Corp.*, No. 13-0380, 2014 WL 46775, at *7 (D.N.J. Jan. 2, 2014) ("[G]iven the complex statutory scheme at work and the government's concession that the monies assessed and the actions taken by the EPA are subject to challenge . . . , the Court cannot conclude that the proposed defenses are categorically without merit.").

    [12] *Cf., e.g.*, *Marshall v. Bd. of Educ.*, 575 F.2d 417, 422 (3d Cir. 1978) ("A judgment may indeed be void, and therefore subject to relief under [Federal Rule of Civil Procedure] 60(b)(4), if the court that rendered it lacked jurisdiction of the subject matter or the parties . . . .").

faith' are not talismanic incantations," but rather "simply terms to guide the district court by expressing [the Third Circuit Court of Appeals'] preference for avoiding default judgments where the circumstances do not justify such a result." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1182-83 (3d Cir. 1984). Accordingly, "the culpable conduct standard requires that as a threshold matter more than mere negligence be demonstrated," *id.* at 1183, and the plaintiff must therefore adduce evidence in the record that shows or supports the inference of "more than mere negligence," *see id.*; *accord, e.g.*, *Chamberlain*, 210 F.3d at 164 ("[N]o record evidence suggests that the defendant's delay in filing an answer was due to culpable conduct . . . ."); *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 52 (3d Cir. 2003) ("Hill offered no reason to believe that the defendants acted willfully or in bad faith, and there is nothing in the record suggesting the defendants were more than negligent." (citing *Hritz*, 732 F.2d at 1183)).

The district court need not hold a hearing to make this determination. *See, e.g. Zawadski de Bueno v. Bueno Castro*, 822 F.2d 416, 419, 423 (3d Cir. 1987) (reversing a district court's refusal, "without a hearing," to vacate default judgment and "conclud[ing] that the record in this case does not support any inference of willfulness or bad faith, but [rather] a conclusion of excusable neglect as a matter of law"). While a conscious "tactic" of allowing the entry of default judgment "as a matter of strategy" is culpable, *Wells v. Rockefeller*, 728 F.2d 209, 214 (3d Cir. 1984), when a mere "breakdown in communication" between attorneys, without more, causes the default, the default is not sufficiently culpable, *Zawadski de Bueno*, 822 F.2d 416, 420-21 (3d Cir. 1987) (citing *Gross*, 700 F.2d at 124). Mere unintentional "oversight" will not suffice. *Dambach*, 211 F. App'x at 110. Finally, a plaintiff's mere insistence, without record evidence, that a defaulting defendant acted culpably or "perpet[r]ated a fraud on the court" is likewise inadequate. *Id. Cf. also generally, e.g.*, *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 689 (9th Cir. 1988) ("[B]ecause judgments by default

are disfavored, a court usually will try to find that there has been an appearance by defendant."

(citation and internal quotation marks omitted)).


III.    DISCUSSION

Because the Court has already held that Mr. Collura has alleged no cognizable prejudice

and that the Defendants' exhibits establish that their default was not culpable, the Court turns to

the question of whether the Defendants have raised meritorious defenses to Mr. Collura's causes

of action. For the reasons discussed below, the Court finds that the Probation Officer Defendants

have raised meritorious defenses to all of Mr. Collura's claims and, therefore, that the Clerk of

Court's entry of default should be set aside.

At first, notwithstanding Mr. Collura's acerbic declarations to the contrary, determining

just what claims Mr. Collura intends to prosecute against the Probation Officer Defendants was

an exercise in augury and guesswork. In the second paragraph of his Complaint, Mr. Collura

declares that he is bringing his action under § 1983 for violation of his federal constitutional

rights under the First, Fourth, Fifth, and Fourteenth Amendments, "all of the Federal

Constitution," and several Pennsylvania laws, including the Pennsylvania Constitution. In the

early stages of this litigation, the Defendants raised, and the Court discussed, the potential

defenses to a variety of claims, without perceiving which claims Mr. Collura would breathe life

into and which were spectral.

Mr. Collura's recent filings have provided helpful clarification regarding his claims

against the Probation Officer Defendants. He explains that his challenge to his conviction was

directed against the City of Philadelphia, but that his claims against "Ford and the rest of the

[Probation Officer Defendants were] for specific actions that were illegal." Mot. Reconsider. 1

(Docket No. 48). In particular, his causes of action against them appear to be, to the exclusion of

any others, "First Amendment and due process based claims" rather than a challenge to the conditions of his probation, because "whether or not it was originally illegal for [Mr. Collura] to be on probation in the first place . . . the violations described that occurred against [Mr. Collura] are still illegal," Mot. Reconsider. 1-2, as well as a Fourth Amendment claim challenging the drug tests to which Mr. Ford subjected him.[13]

### A.      Alleged Violation of Due Process

Although the Court notes the apparent short notice Mr. Ford allegedly gave Mr. Collura of several proceedings (which ultimately appear to have been continued or otherwise

---

[13] For Mr. Collura's characterization of his claims, see Mot. Reconsider. 1-2 (Docket No. 48); Fourth Opp. 10-11 (Docket No. 56) ("every already retaliatory drug test forced upon Plaintiff by Ford was illegal from the door even to start with"); Fourth Opp. 21 ("Ford maliciously scheduled the vop hearing"); Fourth Opp. 24 ("no the notice is not due process rather evidence of retaliation because Plaintiff did report to where he should have"); Fourth Opp. 24 & n.8 ("He also hit Plaintiff with another unwarrantedand [sic] unlawful urine test, in which was never ordered by any court"); Fourth Opp. 30 ("a person's rights to [be] free from f.a. retaliation, to have due process . . . . Plaintiff was given four tests that extracted urine from him . . . that were illegal from the door because they were not authorized by any court via their own policy in which they submitted"); Mot. Strike 4 & n.1 (Docket No. 57); Mot. Strike 11 ("23 hours notice"); Mot. Strike 16 & n.4 ("every already retaliatory drug test forced upon Plaintiff by Ford was illegal from the door to even start with"); Mot. J. Pldgs. 2-3 ("Illegal Urine Test"); Mot. J. Pldgs. 5 ("Unlawful Retaliatory VOP Hearing Scheduling And Unlawful No Notice Of It"); Mot. J. Pldgs. 9 ("Retaliatory Arrest Warrant Warning"); Mot. J. Pldgs. 10 ("Illegal Urine Test"); Mot. Strike 3 (Docket No. 59) ("THE COMPLAINT WENT OUT OF ITS WAY TO STATE CLAIMS IN ITS BODY, FIRST AMENDMENT RETALIATION, DUE PROCESS , ETC.").

The Court recognizes that Mr. Collura additionally presses several state law claims. *E.g.*, Mot. J. Pldgs. 9 (Docket No. 58)  ("Malicious Prosecution And Abuse of Process"). But, as the Court earlier held, "[t]hese [state law] claims are not relevant at this juncture (considering whether to lift default judgment), because if the Probation Officer Defendants establish complete defenses to Mr. Collura's federal claims, the Court will likely lose jurisdiction over Mr. Collura's Pennsylvania law–based claims." *See* Mar. 28, 2014 Order 2 n.2; *see also id.* at 18 n.8. If a defense, for purposes of default judgment, includes, in fact, an opportunity not to defend certain claims in state court, then loss of supplemental jurisdiction certainly counts. In any case, the Court observes that the Defendants have also raised several additional defenses to Mr. Collura's state law claims. *See* Defs.' Supp. Br. 19-22 (Docket No. 41). *See also generally* Section IV.C.

terminated),[14] the short notice period does not translate into a due process claim because Mr. Collura suffered no apparent infringement of his liberty interest: he does not allege that his probation was ever revoked. The Court will not dismiss Mr. Collura's claims *sua sponte*, but, given the applicable standard of review, it must nonetheless observe that understandably Defendants have raised the due process standard in their papers, Defs.' Supp. Br. 16 (Docket No. 41), and thus established a potentially meritorious defense to these claims.

Mr. Collura is correct that the Supreme Court's case law, in particular in *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), mandates that before revocation of probation (or parole), "a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing," *Gagnon*, 411 U.S. at 782, along with other due process requirements, such as "written notice of the claimed violations of" probation, *Gagnon*, 411 U.S. at 786. But these rights are triggered because "the loss of liberty entailed" in the revocation of probation or parole "is a serious deprivation." *Gagnon*, 411 U.S. at 781. Without a loss of liberty, there can be no affront to due process. *See* U.S. Const. amend. XIV, § 1 (". . . nor shall any State deprive any person of life, *liberty*, or property, without due process of law . . . ." (emphasis added)).

Indeed,

> [t]o state a claim under [42 U.S.C.] § 1983 for deprivation of procedural due
> process rights, a plaintiff must allege that (1) he was deprived of an individual
> interest that is encompassed within the Fourteenth Amendment's protection of

---

[14] *See generally, e.g.*, *United States v. Morales*, 45 F.3d 693, 699 (2d Cir. 1995) ("The court may ordinarily be required to offer the defendant a minimum of 10 days in which to prepare for a hearing after receiving notice of the matters that the court will consider in determining whether to modify the conditions of release."); *Friedland v. Fauver*, 6 F. Supp. 2d 292, 307 (D.N.J. 1998) ("There are genuine issues of material fact as to whether providing less than 24 hours notice of the hearing was adequate under *Morrissey* [*v. Brewer*, 408 U.S. 471 (1972)], and, if not, who provided the notice."). *But see generally, e.g.*, *Brown-El v. Hall*, 8 F.3d 20 (5th Cir. 1993) ("The record reveals that Brown-El received notice of the charges and evidence four to seven days before the hearing. He has not alleged any prejudice from the alleged late notice, and we perceive none. We hold that Brown-El was not deprived of due process.").

> "life, liberty, or property," and (2) the procedures available to him did not provide
> "due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

*Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "The first step in evaluating a

§ 1983 claim is to identify the exact contours of the underlying right Plaintiffs claim was violated

and to determine *whether they have alleged deprivation of a constitutional right at all*." *Culinary*

*Serv. of Del. Valley, Inc. v. Borough of Yardley*, 385 F. App'x 135, 141 (3d Cir. 2010) (emphasis

added). The case law is clear that a plaintiff fails to state a due process claim where, even if he

has a life, liberty, or property interest that is cognizable under the Due Process Clause, he "do[es]

not demonstrate a deprivation of that interest." *Ass'n N.J. Rifle & Pistol Clubs v. Gov. of N.J.*,

707 F.3d 238, 241 (3d Cir. 2013); *see also, e.g.*, *Rodrock v. Moury*, 379 F. App'x 164, 166 (3d

Cir. 2010) ("A party who fails to establish the deprivation of a right fails to establish a Section

1983 claim." (citing *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996)). The Constitution does not

secure the right of "due process" to all individuals in all circumstances; rather, the Constitution,

by its explicit terms, requires due process before a "State [may] deprive any person of life,

liberty, or property." U.S. Const. amend. XIV, § 1; *see also Greenholtz v. Inmates of Neb. Penal*

*& Corr. Complex*, 442 U.S. 1, 7 (1979) ("The Due Process Clause applies when government

action deprives a person of liberty or property; accordingly, when there is a claimed denial of

due process we have inquired into the nature of the individual's claimed interest.").

Although the Probation Officer Defendants focus primarily on their proffer that Mr.

Collura "received meaning[ful] notice and an opportunity to be heard in connection with his

probation requirements," because, they contend, "[a]t trial, [they] will prove that [Mr. Collura]

received proper notice of all probation-related requirements, in accordance with governing law

and Probation Department procedures," Defs.' Supp. Br. 16, the Court need not address that

contention at this juncture. Defendants cite *Hill v. Borough of Kutztown*, 455 F.3d at 233-34, for

the proposition that a plaintiff bringing a procedural due process claim "must allege . . . that he or she *was deprived of an individual interest* that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property.'" Defs.' Supp. Br. 16 (emphasis added).

A review of procedural due process case law suggests that most individuals do not attempt to sue before they have suffered any deprivation of an alleged life, liberty, or property interest. *E.g.*, *Iles v. de Jongh*, 638 F.3d 169, 171 (3d Cir. 2011) ("Both employees sued the Governor and the Government of the Virgin Islands, claiming that *their terminations* deprived them of their property interests in public employment without due process of law." (emphasis added)); *see also, e.g.*, *United States v. Kirtley*, 5 F.3d 1110, 1112 (7th Cir. 1993) ("First, we must determine whether Kirtley *was deprived of* a protected due process interest." (emphasis added)); *cf., e.g.*, *Pugliese v. Nelson*, 617 F.2d 916, 922-23 (2d Cir. 1980) ("Nor does an incarcerated prisoner against whom a detainer has been filed for violation of parole on another conviction have a sufficient interest to entitle him to an immediate hearing, since his 'loss of liberty as a parole violator does not occur until (he) is taken into custody under the warrant,' even though a prompt hearing could possibly result in his serving sentences concurrently rather than consecutively." (citing *Moody v. Daggett*, 429 U.S. 78, 87 (1976)). And, in fact, all the cases Mr. Collura cites in support of his due process claim, *see* Compl. 36-38; Collura's Mot. J. Pldgs. 8-9 (Docket No. 58), relied on the deprivation of liberty because probation or parole *was revoked*, as the pin cites provided in the margin confirm.[15]

_____

[15] *Gagnon v. Scarpelli*, 411 U.S. at 780; *Morrissey*, 408 U.S. at 472-73 (1972); *United States v. Gallo*, 20 F.3d 7, 14 (1st Cir. 1994); *United States v. Simmons*, 812 F.2d 561, 562 (9th Cir. 1987); *United States v. Dane*, 570 F.2d 840, 841 (9th Cir. 1977); *Commonwealth v. Allshouse*, 969 A.2d 1236, 1238-39 (Pa. Super. Ct. 2009); *Commonwealth v. Carver*, 923 A.2d 495, 495-96 (Pa. Super. Ct. 2007); *Commonwealth v. Ferguson*, 761 A.2d 613, 615 (Pa. Super. Ct. 2000); *Knight v. Commonwealth*, 510 A.2d 402, 403 (Pa. Commw. Ct. 1986), *overruled on other grounds by Johnson v. Commonwealth*, 527 A.2d 1107, 1108 (Pa. Commw. Ct. 1987); *Commonwealth v. DeLuca*, 418 A.2d 669, 670-71 (Pa. Super. 1980); *Champion v. Commonwealth*, 399 A.2d 447, 448 (Pa. Commw. 1979); *Commonwealth v. Honeyblue*, 396

As the Supreme Court has explained,

> With only a prospect of future incarceration which is far from certain, we cannot say that the parole violator warrant has any present or inevitable effect upon the liberty interests which *Morrissey* sought to protect. Indeed, in holding that "(t)he revocation hearing must be tendered within a reasonable time after the parolee is taken into custody," *Morrissey*, 408 U.S., at 488, we established execution of the warrant and custody under that warrant as the operative event triggering any loss of liberty attendant upon parole revocation. This is a functional designation, for the loss of liberty as a parole violator does not occur until the parolee is taken into custody under the warrant.

*Moody*, 429 U.S. at 86-87 (emphasis added).

Because Mr. Collura's probation was not actually revoked, and he has identified no other liberty (or property) interest of which the Defendants allegedly deprived him, he appears to have failed to state a due process claim. Further, the fact that Mr. Collura's probation *might* be revoked in the future is not enough to permit him to bring a due process claim at this juncture. The appropriate time and place for Mr. Collura to raise his due process argument that he was afforded inadequate notice must, in the first instance, be before the judge on any hearing to revoke his probation. *Cf., e.g.*, *Martinez v. Davis*, No. 10-1175, 2010 WL 3720226, at *2-3 (D. Colo. Sept. 14, 2010) ("[T]o the extent Mr. Martinez contends he has been unable to defend against the revocation of his probation, the claim is premature. . . because the issue is not ripe for adjudication. . . . Mr. Martinez's probation has not been revoked. . . ."); *Vinson v. Dep't of Prob.*, 472 F. Supp. 1112, 1114 (E.D.N.Y. 1979) ("This determination awaits petitioner when he is finally afforded a hearing on the alleged violations and is clearly not ripe for review on this petition, despite petitioner's claim that he is under a threat of serving his earlier sentence on an installment plan."); *Augello v. Warden, Metro. Corr. Ctr.*, 470 F. Supp. 1230, 1234 (E.D.N.Y.

---

A.2d 683, 684 (Pa. Super. Ct. 1978); *United States v. Hamilton*, 708 F.2d 1412, 1414 (9th Cir. 1983); *Commonwealth v. Williams*, 385 A.2d 979, 980 (Pa. Super. Ct. 1978); *Commonwealth v. Ballard*, 378 A.2d 445, 445-46 (Pa. Super. Ct. 1977); *Commonwealth v. Harris*, 380 A.2d 471, 472 (Pa. Super. Ct. 1977); *Commonwealth v. Parker*, 378 A.2d 970, 970 (Pa. Super. Ct. 1977); *Commonwealth v. Davis*, 336 A.2d 616, 618-19 (Pa. Super. Ct. 1975).

1979) ("[W]hile petitioner might well be correct in his contention that respondents' failure, if any, to disclose evidence they intend to use against him at the final hearing might violate federal law, this claim is not ripe for decision since petitioner's final hearing is not set to be held [for another week]." (citation omitted)).[16]

### B.     Alleged First Amendment Retaliation

The Defendants contend that they have a meritorious defense to Mr. Collura's First Amendment retaliation claims because, among other things, "there is no evidence of a causal connection between any alleged protected speech by [Mr. Collura] and allegedly retaliatory conduct by the Individual Defendants." Defs.' Supp. Br. 15. Rather than take any "adverse actions" against Mr. Collura because of his speech, the Defendants contend, "they reasonably and properly applied lawful policies of the Probation Department in overseeing [Mr. Collura's] probation sentence, and . . . any alleged 'adverse actions' were the lawful result of [Mr. Collura's] misconduct or non-cooperation with the Probation Department." Defs.' Supp. Br. 15.

First Amendment retaliation case law often focuses on the context of public employees or the alleged mistreatment of inmates, but the Court discerns some generally applicable principles. "A prisoner alleging retaliation," for instance, "must show (1) constitutionally protected conduct, (2) an adverse action by prison officials '"sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,"' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" *Mitchell v. Horn*, 318 F.3d 523,

---

[16] Moreover, as the Court suggested earlier in this case, "the spirit of the *Younger* doctrine prohibits a federal court from derailing a pending probation revocation proceeding." *Martinez*, 2010 WL 3720226, at *3 (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Sarlund v. Anderson*, 205 F.3d 973, 975 (7th Cir. 2000)); *cf. also, e.g., Carter v. County of San Diego*, No. 13-0289, 2013 WL 4028097, at *4 (S.D. Cal. Aug. 6, 2013) ("To the extent Plaintiff seeks an injunction requiring recall of the bench warrant or enjoining enforcement of the bench warrant, the Court abstains under *Younger v. Harris*, 401 U.S. 37, 41 (1971).").

530 (3d Cir. 2003) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir .2001) (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)) (alteration in original)).

The second prong, "adverse action," is context-dependent. "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Allah*, 229 F.3d at 224-25 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir.1999) (en banc) (per curiam)); *accord Mitchell*, 318 F.3d at 530; *see also, e.g.*, *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) ("[O]fficials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights . . . even where the action taken in retaliation would be otherwise permissible." (internal quotation marks and citation omitted)). "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (emphasis in *Brennan*); *accord, e.g.*, *Allah*, 229 F.3d at 225 ("Although it is possible that in some cases placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights, we cannot say that such action can never amount to adverse action. On the contrary, whether a prisoner-plaintiff has met that prong of his or her retaliation claim will depend on the facts of the particular case."); *Thaddeus-X*, 175 F.3d at 398 ("[T]he definition of adverse action is not static across contexts."); *see also, e.g.*, *Chruby v. Kowaleski*, 534 F. App'x 156, 161 (3d Cir. 2013) ("Without deciding the general issue of whether threats can constitute adverse action, today we will affirm the District Court's conclusion that the verbal threats alleged were not sufficient to deter Chruby from exercising his constitutional rights.");

Under the "causal-link" prong, in both the public employment and prison contexts, "the plaintiff b[ears] the initial burden of proving that his constitutionally protected conduct was 'a substantial or motivating factor'" in the action adverse to him. *Rauser*, 241 F.3d at 333-34. Thus, a prisoner's First Amendment retaliation claim arising from the allegedly retaliatory revocation of his parole will flounder, for instance, if he "fail[s] to demonstrate a causal connection between his filing of grievances and his arrest and parole remand." *Carter v. Morrisson*, 429 F. App'x 114, 119 (3d Cir. 2011) (per curiam). Moreover, in the prison context, defendant "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334.

Upon review of Defendants' Amended Proposed Answer, the Court determines that the Defendants' factual allegations, if proven, would establish that they did not take whatever actions they took, whether or not sufficiently "adverse" for the purposes of the First Amendment retaliation standard, in retaliation for any protected speech by Mr. Collura. To the contrary, Defendants "specifically [deny] that actions of Parole Officer Defendant Ford were 'to retaliate' against Plaintiff in any manner," APA ¶ 14, and state that the tests were done "in the ordinary course of probation supervision" to monitor Mr. Collura's compliance with his probation terms. SS 11.

Further, the Defendants' Supplemental Submission in Support of their Motion to Set Aside the Clerk of Court's Entry of Default details Collura's behavior on April 12, 2012, the day of the first probationary drug test alleged in Mr. Collura's Complaint, but it does not state that Probation Officer Ford ordered a drug test *because* of Collura's behavior. According to the Defendants' Supplemental Submission and their Proposed Amended Answer, "Mr. Ford's practice was to conduct random drug screening of all probationers whom he supervised; he

typically requested that probationers take a drug test at several visits in a row, followed by a gap of several months before taking another test." SS 4; Defs.' APA ¶ 16. Defendants argue that on three occasions between April and October 2012, Mr. Collura "was lawfully and properly given a urinalysis drug screening for controlled substances in accordance with the Mental Health Unit policy concerning drug screenings and in order to evaluate Plaintiff's compliance with the Rules of Probation and Parole, which prohibited Plaintiff from using controlled substances." SS 5, 8, 11; APA ¶¶ 13, 36.

Mr. Ford's administration of the drug tests may have Fourth Amendment ramifications, as addressed below, but if, as Defendants contend, Mr. Ford subjected Mr. Collura to urinalysis as part of his "practice [of] random drug screening of all probationers whom he supervised," then, it follows that Mr. Ford did not take these actions because of any protected speech by Mr. Collura. Further, the Court observes, "[i]n the prison context, [courts] treat [retaliation] claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)) (third alteration in original). Defendants also contend, specifically, that "any alleged 'adverse actions' were the result of [Mr. Collura's] misconduct or non-cooperation with the Probation Department." Defs.' Supp. Br. 15. Of course, the Court is not accepting Defendants' characterization for purpose of resolution of Mr. Collura's claims. Rather, the relevant question here is whether the Defendants' assertions, if proven, would constitute a defense to Mr. Collura's First Amendment retaliation claim. For the reasons described above, the Court finds that they would. Defendants' defense is facially meritorious, and so they are entitled to attempt to defend this claim.[17]

---

[17] Mr. Collura also appears to raise (conclusorily) an equal protection claim in his earlier papers, *see* Compl. 0, 39; Opp. Mot. Dismiss 2 (Docket No. 25), but, to the extent he still asserts this claim against the Probation Officer Defendants, it fails because, as Defendants point out,

## C. Alleged Unlawful Urinalysis (Ostensible Fourth Amendment Claims)

The Court construes Mr. Collura's contention that Mr. Ford's administration of urinalysis was "illegal from the door," *e.g.*, Collura Mot. J. Pldgs. 2, to sound under the Fourth Amendment, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is settled law that the collection and analysis of a urine sample to test for drug use constitutes a search that is subject to the constraints of the Constitution's Fourth Amendment." *Kerns v. Chalfont-New Britain Twp. Joint Sewage Auth.*, 263 F.3d 61, 65 (3d Cir. 2001) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989)).

---

Defs.' Supp. Br. 16-17, he refers to no similarly situated comparators. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). A plaintiff's failure to "allege any facts showing that he was treated differently than any similarly situated individuals" is fatal to his equal protection claim. *E.g.*, *Slavoski v. Pawlowski*, 462 F. App'x 215, 218 (3d Cir. 2012).

"Mr. Collura has failed to identify any similarly situated individual whom [Defendants] ha[ve] treated differently. . . . Accordingly, Mr. Collura's Equal Protection claim amounts to mere 'general accusations' which are insufficient to prevail on a § 1983 claim." *Collura v. Disciplinary Bd. of Supreme Court of Pa.*, No. 11-5637, 2013 WL 4479141, at *7 (E.D. Pa. Aug. 22, 2013), *aff'd sub nom. Collura v. Maguire*, --- F. App'x ----, No. 13-3857, 2014 WL 2766760 (3d Cir. June 19, 2014). *Accord also, e.g.*, *Gomez v. Feissner*, 474 F. App'x 53, 57-58 (3d Cir. 2012) ("Because [Plaintiff] does not allege that either [Defendant] treated him differently from any similarly situated individuals that actually existed, he fails to state a valid equal protection claim against them."); *Santos v. Sec'y of DHS*, 532 F. App'x 29, 34 (3d Cir. 2013) (per curiam) ("[T]he amended complaint asserts blanket, non-specific allegations that Santos was treated differently because of his race and/or gender. There are no specific allegations illustrating how Santos was treated differently than those similarly situated. Accordingly, the Equal Protection claims also fail."); *Johnson v. Phila. Hous. Auth.*, 448 F. App'x 190, 193 (3d Cir. 2011) (per curiam) ("Johnson has not pleaded that he was treated differently from any similarly situated person or group.").

Probationers such as Mr. Collura do not have the same Fourth Amendment rights as the general populace. As the Supreme Court has explained in *United States v. Knights*, 534 U.S. 112 (2001),

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). Knight's status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'" *Griffin* [*v. Wisconsin*, 483 U.S. 868], 874 [(1987)] (quoting G. Killinger, H. Kerper, & P. Cromwell, Probation and Parole in the Criminal Justice System 14 (1976)). Probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." 483 U.S., at 874. Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" *Ibid.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

*Knights*, 534 U.S. at 118-19.

In *Knights*, the Supreme Court upheld a police search conducted pursuant to the terms of the defendant's probation which permitted searches "with or without a search warrant, warrant of arrest or reasonable cause." 534 U.S. at 114-15. Balancing the intrusion on the defendant's expectation of privacy against the government's legitimate interests in conducting the search, the Court relied on the fact that, although the police did not have a warrant, they did have reasonable suspicion. *Id.* at 114-18. "[A] salient circumstance" in the Court's reasoning was the fact that the conditions of the defendant's probation purported to authorize the search. *Id.* at 118. The Supreme Court did *not* decide, however, "whether the probation condition so diminished, or completely eliminated, [the defendant's] reasonable expectation of privacy . . . [such] that a

search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment." *Id.* at 120 n.6.

Five years later, in *Samson v. California*, 547 U.S. 843 (2006), the Supreme Court addressed, with respect to parolees, the question it had reserved in *Knights*. *Id.* at 847 & n.1 The Court upheld a California law that authorized searches of parolees "with or without a search warrant and with or without cause." *Id.* at 846. Applying the same balancing test it had employed in *Knights*, the *Samson* Court, explaining that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment," *id.* at 850, "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee," *id.* at 857.

Neither the Supreme Court nor the Third Circuit Court of Appeals has addressed the question of when a probation officer can conduct a suspicionless search of a probationer and, if so, whether the probation officer may conduct such a suspicionless search in the absence of probation conditions expressly authorizing that search. Only one federal appellate case appears to be on point. In *United States v. King*, 736 F.3d 805 (9th Cir. 2013), *reh'g en banc denied*, *id.*, the Ninth Circuit Court of Appeals held that "a suspicionless search [of a probationer], conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment." *Id.* at 810. But the Ninth Circuit Court of Appeals, in keeping with the Supreme Court's gradual approach to constitutional interpretation, expressly observed that it "need not decide whether the Fourth Amendment permits suspicionless searches of probationers who have *not* accepted[18] a suspicionless-search condition, or of lower level offenders who have accepted a suspicionless-search condition." *Id.*

---

[18] "Accepted" is an odd word choice given that there is no authority for the proposition that convicts are entitled to dictate the terms of their probation.

In *Griffin v. Wisconsin*, 483 U.S. 868, by contrast, the Supreme Court created a different

exception, known as the "special needs" exception, "to the Fourth Amendment's warrant

requirement in the context of parolee searches." *United States v. Freeman*, 479 F.3d 743, 746

(10th Cir. 2007); *see also State v. Schlechty*, 926 N.E.2d 1, 5-6 (Ind. 2010) ("*Knights* and *Griffin*

represent different ways in which a probation search may be analyzed." (citing, inter alia, *United*

*States v. Herndon*, 501 F.3d 683, 688 (6th Cir. 2007))). In *Griffin*, the Supreme Court explained

that probation

> restrictions are meant to assure that the probation serves as a period of genuine
> rehabilitation and that the community is not harmed by the probationer's being at
> large. *See State v. Tarrell*, 247 N.W.2d 696, 700 (1976). These same goals require
> and justify the exercise of supervision to assure that the restrictions are in fact
> observed. Recent research suggests that more intensive supervision can reduce
> recidivism, see Petersilia, Probation and Felony Offenders, 49 Fed. Probation 9
> (June 1985), and the importance of supervision has grown as probation has
> become an increasingly common sentence for those convicted of serious crimes,
> see *id.*, at 4. Supervision, then, is a "special need" of the State permitting a degree
> of impingement upon privacy that would not be constitutional if applied to the
> public at large. That permissible degree is not unlimited, however . . . .

*Griffin*, 483 U.S. at 875. The Court then upheld the search of Mr. Griffin's residence as

"'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant

to a valid regulation governing probationers," and the probation officer had "'reasonable

grounds' to believe contraband [was] present." *Id.* at 880. And, again, the Supreme Court

reserved a question: "whether . . . *any* search of a probationer's home by a probation officer is

lawful when there are 'reasonable grounds' to believe contraband is present." *Id.*

Of course, it may be that "*Samson*, like *Griffin*, has little to no bearing on whether a

warrantless search not authorized by statute, regulation or condition of supervision is

permissible." *United States v. Kone*, 591 F. Supp. 2d 593, 603 (S.D.N.Y. 2008) (citing *Freeman*,

479 F.3d at 748). It thus may be that "[p]arolee [and probationer] searches are . . . an example of

the rare instance in which the contours of a federal constitutional right are determined, in part, by

the content of state law." *Freeman*, 479 F.3d at 747-48; *see also id.* at 748 ("*Samson* does not represent a blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the Court approved the constitutionality of such searches only when authorized under state law. Kansas has not gone as far as California in authorizing such searches, and this search therefore was not permissible in the absence of reasonable suspicion."). *But see also, e.g.*, *United States v. Duff*, 831 F.2d 176, 179 (9th Cir. 1987) (upholding warrantless urine testing of a probationer in the absence of such a specific condition of probation because "the urine testing employed here was narrowly tailored to determine whether Duff was using drugs and was less intrusive of Duff's privacy than other methods of monitoring, such as continuous surveillance or repeated searches of Duff's home and property[, and t]he probation officer had a reasonable suspicion that Duff might be using drugs . . [and] that drug testing was necessary to foster the offender's reformation and to preserve the public's safety" (citation and internal quotation marks omitted)).

Mr. Collura's case appears to present these questions that the Ninth Circuit Court of Appeals reserved in *King*. Under Pennsylvania law, a probation officer may conduct a personal search of a probationer "if there is a *reasonable suspicion* to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision." 42 Pa. Cons. Stat. Ann. § 9912(d)(1)(i) (emphasis added). Reasonable suspicion is "determined in accordance with constitutional search and seizure provisions as applied by judicial decision," and is to take into account several factors, including the probation officer's experience with the probationer, information provided to the officer by the probationer, and the need to verify compliance with the conditions of supervision. *See id.* § 9912(d)(6)(i)–(viii). These terms appear to be incorporated into the conditions of Mr. Collura's probation, which state that "you are subject to a personal search and/or property search, including vehicle and the seizure of any contraband

found, if there is reasonable suspicion to believe that you are in violation of any of the conditions of supervision." Rules of Probation and Parole ¶ 10, SS Ex. G. Mr. Collura's conditions of supervision also admonish him "not [to] unlawfully possess, use, sell or distribute controlled substances of any kind." Rules of Probation and Parole ¶ 7. But, as Mr. Collura points out, the Mental Health Unit's Policy and Procedure states that while "[a]ll offenders should be given a drug test on the first office visit," "[m]*onthly* urinalyses are conducted on all offenders *if drug testing is ordered by the Court*." Policy and Procedure 3, SS Ex. H.

The questions here can be clarified as follows, then: First, did Probation Officer Ford have reasonable suspicion to believe that Mr. Collura may have been at risk of violating a condition of his probation when he subjected Mr. Collura to urinalysis? Second, did Mr. Ford need reasonable suspicion (and, if so, what quality or quantity), or, in fact, would the Third Circuit Court of Appeals or the United States Supreme Court answer the question reserved in *King* to permit suspicionless searches of probationers?

Although there may be some implication that suspicionless searches are only permissible where they are an explicit condition of probation, *e.g.*, *Freeman*, 479 F.3d at 747 ("In *Samson* . . . the Supreme Court . . . noted 'that some States and the Federal Government require a level of individualized suspicion,' and strongly implied that in such jurisdictions a suspicionless search would remain impermissible." (citing *Samson*, 547 U.S. at 855)),[19] the law remains unclear on this point. Questions remain, not only regarding whether *Knights* would be extended

---

[19] *See also, e.g.*, *United States v. Wryn*, 952 F.2d 1122, 1125 (9th Cir. 1991) ("If Montana law were silent on this subject, the government's argument might be persuasive. But Montana law is not silent. Montana Department of Institutions administrative rule 20.7.1101(7) provides that, while on probation, a probationer, shall submit to a search of his residence by a probation officer at any time of the day or night, without a warrant but upon reasonable cause ascertained by the probation officer, '*if so ordered by the sentencing court*.' (emphasis added). This state regulation extends to a probationer the right under the fourth amendment to be free from a warrantless search of his residence unless such a search is authorized by the sentencing court. The search of Wryn's residence was not so authorized, and thus it violated the Constitution." (footnote omitted)).

to suspicionless searches in the absence of corresponding probation conditions, but also as to whether *Griffin* might be extended to encompass such situations. *Cf., e.g.*, *United States v. Strickland*, 237 F. App'x 773, 777 n.4 (3d Cir. 2007) ("Because we find that the parole officers had reasonable suspicion to conduct a warrantless search of Strickland's residence under *Griffin*, we need not resolve whether *Knights* also applies to this case."); *id.* at 777 ("This case does not present the question of the precise parameters of the special needs justification for a warrantless search of a parolee's residence. Nor does it present a challenge to the Pennsylvania statute authorizing county probation and parole officers to conduct searches of parolees' real property based upon reasonable suspicion.").[20]

*Griffin*'s "special needs" rationale, after all, is rather broad: "the very assumption of the institution of probation [is] that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law." *Griffin*, 483 U.S. at 880; *cf. also, e.g.*, *Schlechty*, 926 N.E.2d at 5-6 ("In sum, a warrantless probation search under *Griffin* may be justified on the basis of reasonable suspicion to believe a probation violation has occurred because, among other things, supervision of probationers is necessary to ensure that probation restrictions are in fact observed, and that the community is not harmed by the probationer being at large."). Thus, at this stage, this Court is "not prepared at this time to say that" the Defendants' implicit defense here, namely, that Mr. Ford's standard practice was to randomly drug test all of his probationers, "is facially unmeritorious," *Gross*, 700 F.2d at 123. *Cf. also, e.g.*, *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004) ("The Supreme Court has, notably, refrained from addressing whether

---

[20] *See also generally Strickland*, 237 F. App'x at 779-82 (Rendell, J., concurring) (distinguishing *Knights* on the ground that "[i]n Strickland's case, we have no evidence that [a suspicionless search] condition was imposed and, in any case, Pennsylvania law requires that parole searches be based on reasonable suspicion", and observing that "[t]he line between normal law enforcement searches and special needs searches becomes very fine when parole and probation are involved, and thus additional care is required in how courts approach such searches" (footnote omitted)).

the 'special needs' of the probation system justify imposing drug testing conditions in conjunction with sentences of probation. Although . . . we do not decide this issue today, other circuits have upheld such measures . . . .").

Moreover, it is far from clear that in the circumstances of this case—which are, of course, as yet undeveloped by discovery—that Mr. Ford did not have reasonable suspicion. After all, reasonable suspicion does not necessarily mean "individualized suspicion." The question of what the overall circumstances must show, especially as they relate to the State's interests in both rehabilitating the probationer as well as preventing him from reoffending and harming others, remains open and the relevance of such factors as a probationer's assignment to the Mental Health Unit (as was the case with Mr. Collura), his apparent periods of homelessness, or his allegedly belligerent and irregular behavior (all hotly contested issues, but Defendants' version controls at this stage), undecided, as a matter of both law and fact.[21] In fact, some courts have appeared to go so far as to hold that "[t]he purpose of urine testing is narrowly tailored to determine whether the parolee [or probationer is] using drugs and is less intrusive to parolee's [or probationer's] privacy than other methods of monitoring" and thus, because it "furthers a legitimate governmental interest of rehabilitating prisoners and enforcing the law . . . , [it] is not an unreasonable intrusion of [a probationer's or a parolee's] privacy rights." *Hadden v. Jacobs*,

---

[21] *Cf., e.g.*, *Commonwealth v. Bynoe*, 4 N.E.3d 1272, 1281 n.12 (Mass. App. Ct. 2014) ("The order to submit to a single drug test was not a new and more punitive condition of probation, but simply a reasonable means of enforcing a term of probation established by the sentencing judge."); *State v. Sigler*, 769 P.2d 703, 705 (Mont. 1989) ("[T]he court also found that the probation officer was authorized to require the respondent to submit to urine testing and that the probation officer felt 'the rehabilitation process could not begin until he was certain the Defendant was free from drugs . . . .' Further, it is undisputed that the respondent had not passed a drug test from the time of his arrest until directed to appear for the February 4, 1988 urinalysis. We find such evidence is sufficient to establish reasonable grounds for requiring the respondent to submit a urine sample for determining whether or not the respondent is complying with the conditions of the suspended sentence.").

No. 90-0759, 1990 WL 26677, at *1 (E.D. Pa. Mar. 12, 1990).[22] But the facts here, as well as the posture of the case, are as yet too uncertain to resolve these issues at this time.

For these reasons, and especially given that "in a close case doubts should be resolved in favor of setting aside the default and obtaining a decision on the merits," *Farnese*, 687 F.2d at 764, the Court will exercise its discretion to find that the Defendants have alleged facts and the implicit basis for a legal theory that could allow them, if they prove their version of events, to prevail at trial against Mr. Collura's Fourth Amendment claims.

## IV.     OTHER MOTIONS

Because the Court sets aside the Clerk of Court's entry of default, the Court also addresses Mr. Collura's "Motion to Strike Waived 'Affirmative Defenses' in Above Defendants Untimely 'Amended Proposed Answer'" ("Motion to Strike," Docket No. 57) and Motion for Full or Partial Judgment on the Pleadings ("Motion for Judgment on the Pleadings," Docket No. 58). For the reasons set out below, the former will be granted in part and denied in part and the latter will be denied.

---

[22] Similarly broad statements may also be found in a relevant treatise. *See* 2 David Evans, *Drug Testing Law, Technology and Practice* § 8:26 (West 2014) ("Drug testing of probationers is reasonable, as long as the circumstances are not arbitrary or unreasonable and the purpose of the drug test is related to conviction or rehabilitation. The probationer's offense does not have to be drug related in order for drug tests to be mandated. Requiring that the probationer abstain from drug use is reasonable, and drug testing, including random testing, is a reasonable method of enforcing the condition. . . . Although drug tests are considered to be searches under the Fourth Amendment, drug tests are permissible searches if they are reasonable and based on the belief that the tests are necessary in furtherance of the officer's duties. . . ." (footnotes omitted)).

Furthermore, the lack of clarity on this issue might provide some basis—depending on the facts—for Defendants' qualified immunity defense, although the Court does not address the issue at this juncture. *Cf., e.g.*, *Lumsden v. Ramsey Cnty. Cmty. Corr. Dep't*, No. 00-2223, 2003 WL 221806, at *6 (D. Minn. Jan. 28, 2003) ("[E]ven if a search of Plaintiff's home without a warrant would violate his Fourth Amendment rights, under the circumstances of his probation and the governing law, such right would not be so clearly established as to deprive Paul of immunity.").

Additionally, the Court resolves Mr. Collura's other pending motions seeking reconsideration, disqualification of opposing counsel, the striking of sealed defense exhibits, and an ECF account, and, potentially, recusal.

## A.  Motion to Strike (Docket No. 57)

Mr. Collura moves to strike the "affirmative defenses" in the Defendants' Amended Proposed Answer as insufficient as a matter of law. *See* Mot. Strike 20. For the following reasons, the Court grants in part and denies in part Mr. Collura's Motion to Strike, without prejudice to the Defendants' repleading defenses in such manner as may be consistent with the following analysis.[23]

### 1.  Standard of Review for Motions to Strike Based on Insufficient Defenses

Federal Rule of Civil Procedure 12(f) provides, in full:

(f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f).

Motions to strike are generally "viewed with disfavor . . . and are infrequently granted."

5C Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 1380 (3d ed. Ar. 2014). A motion to strike insufficient defenses will "usually will be denied unless the

---

[23] Although the Defendants are correct that Mr. Collura's Motion to Strike was premature when filed (because the Clerk of Court's entry of default was in effect and the Court had not yet permitted them to file an answer), now that the Court is lifting the entry of default, no reason remains for delaying the resolution of this Motion. *Cf. also, e.g.*, *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989) ("[W]here, as here, motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay.").

allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Knitting With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2009 WL 973492, at *6 (E.D. Pa. Apr. 8, 2009) (quoting *River Road Dev. Corp. v. Carlson Corp.*, No. 89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990)). "A motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact [because] a motion to strike is not the appropriate procedure to determine disputed or unclear questions of law." *Linker v. Custom-Bilt Mach. Inc.*, 594 F. Supp. 894, 898 (E.D. Pa. 1984). Thus, a motion to strike should only be granted when "the insufficiency of the defense is clearly apparent." *Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986). In fact, some courts have opined that "[s]triking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice." *Johnson v. Anhorn*, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004) (quoting *United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931 (S.D. Ohio 2002)).

Though *Twiqbal*[24] has "been read to require that plaintiffs plead factual allegations that show a 'plausible entitlement to relief' and 'raise a right to relief above the speculative level,'" district courts have disagreed on "whether [this heightened] plausibility standard has raised the bar for affirmative defenses." *Dann v. Lincoln Nat'l Corp.*, 274 F.R.D. 139, 145 (E.D. Pa. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)). No court of appeals has yet weighed in, but "the majority of district courts in this Circuit to address the issue," in keeping with the general principles regarding motions to strike, have declined to extend *Twiqbal* to affirmative defenses. *Malibu Media LLC v. Does 1*, No. 12-2078, 2013 WL 1702549, at *2 (E.D. Pa. Mar. 6, 2013) (citing cases).[25] Consistent with its prior holdings, *see Vurimindi v. Fuqua Sch.*

---

[24] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[25] *See also, e.g., Klaus v. Jonestown Bank & Trust Co.*, No. 12-2488, 2014 WL 1024591, at *1 n.1 (M.D. Pa. Mar. 14, 2014); *Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 303 (D. Del. 2013); *Tyco Fire Prods., LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 900 (E.D. Pa. 2011); *FTC v. New Hope Modifications, LLC*, No. 09-1204, 2011 WL 883202, at *3 (D.N.J.

*of Bus.*, No. 10-234, 2011 WL 3803668, at *2-3 (E.D. Pa. Aug. 29, 2011), this Court will likewise not apply *Twiqbal* to a motion to strike affirmative defenses.

Still, even though *Twiqbal*'s heightened standard does not apply, Federal Rule of Civil Procedure 8 requires responsive pleadings to "state in short and plain terms [the party's] defenses." Fed. R. Civ. P. 8(b)(1)(A). "[E]ven before *Twombly* and *Iqbal*, affirmative defenses had to provide the plaintiff with fair notice of the nature of the defense," and so "bare bones conclusory allegations" have always been at risk of being struck. *Dann*, 274 F.R.D. at 145; *accord, e.g.*, *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1295 (7th Cir. 1989) (striking as "bare bones conclusory allegations" affirmative defenses that "omitted any short and plain statement of facts and failed totally to allege the necessary elements of the alleged claims.); *BJ Energy LLC v. PJM Interconnection, LLC*, No. 08-3649, 2010 WL 1491900, at *2 (E.D. Pa. Apr. 13, 2010) ("An affirmative defense stated in general terms will not be deemed insufficient as long as it gives plaintiffs fair notice of the nature of the defense."). Of course, an affirmative defense may also be stricken "where it cannot succeed under any set of facts which may be inferred from the allegations of the pleading," *BJ Energy*, 2010 WL 1491900, at *2, because there is no relevant dispute of fact and the defense is insufficient as a matter of law, *Linker*, 594 F. Supp. at 898. *See also generally* 5C Wright and Miller, *supra*, § 1381.

### 2. Application to Defendants' "Affirmative Defenses"

The Court will strike several of the Defendants' affirmative defenses as too conclusory, and unsupported by sufficient factual allegations, to put Mr. Collura on notice of the import of those defenses. In particular, the Defendants plead (1) the doctrines of laches, waiver, estoppel, and/or unclean hands; (2) that Defendant Probation Officers' purported actions or omissions

---

Mar. 10, 2011); *Romantine v. CH2M Hill Eng'rs, Inc.*, No. 09-0973, 2009 WL 3417469, at *1 (W.D. Pa. Oct. 23, 2009); *Charleswell v. Chase Manhattan Bank*, No. 01-0119, 2009 WL 4981730, at *4 (D.V.I. Dec. 8, 2009).

were not the proximate cause of any alleged injury; (3) that Mr. Collura failed to take reasonable measures to mitigate any or all damages; and (4) that Mr. Collura's injuries were caused by his own negligent, wanton, reckless, or criminal conduct. APA 16-18. In pleading these affirmative defenses, Defendants neither outline the elements of the defenses nor allege any facts in support of each assertion. This boilerplate pleading fails to provide Mr. Collura with fair notice of the nature or underpinning of the defenses and so the Court will therefore grant Mr. Collura's motion in part and strike the four aforementioned defenses from the Defendants' Proposed Amended Answer.[26]

\*     \*     \*

The Court will also strike several of the Defendants' "affirmative defenses" as insufficient as a matter of law, or, stated otherwise, inapplicable even if accepting all of Mr. Collura's allegations as true. The parties' submissions in this case have by now clarified that Mr. Collura's claims against the Probation Officer Defendants do not challenge the validity of Mr. Collura's underlying conviction, but rather only the Defendants' alleged manner of supervising Mr. Collura's probation. Because Mr. Collura has challenged no state court judgment vis-à-vis the Probation Officer Defendants, the Court finds the *Rooker–Feldman* doctrine inapplicable.[27]

---

[26] The Court therefore does not reach the question of whether equitable defenses may be interposed in this action. *See generally, e.g.*, *J&J Sports Prods., Inc. v. Gonzalez*, No. 12-6313, 2013 WL 6022225, at *3-4 (E.D. Pa. Nov. 14, 2013); *cf. generally Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1973-74 (2014) ("[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation.").

[27] Under *Rooker–Feldman*, "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010). Named after the two Supreme Court cases that announced it, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), *see Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011), the doctrine instructs "that the Supreme Court of the United States, and not the lower federal courts, has jurisdiction to review a state court decision," *Parkview Assocs. P'ship v. City of Lebanon*, 225 F.3d 321, 324 (3d Cir. 2000). The doctrine is not broad, but, rather, stands for

Further, because Mr. Collura does not appear to challenge here any state court judgment or holdings, res judicata is inapplicable.[28]

For similar reasons, because Mr. Collura has clarified that he is not challenging the imposition or duration of his probation, the *Heck* defense is not applicable to his claims against the Probation Officer Defendants. *See Heck v. Humphrey*, 512 U.S. 477 (1994). When *Heck* and its progeny apply, they make collateral attacks on a conviction that has not been overturned "uncognizable" under § 1983—that is, impossible to pursue, except through the appropriate habeas corpus procedures. *See, e.g.*, *Williams v. Consovoy*, 453 F.3d 173, 177 (3d Cir. 2006); *see also, e.g.*, *Edwards v. Balisok*, 520 U.S. 641, 643, 649 (1997); *Torres v. Fauver*, 292 F.3d 141, 146. The *Heck* cases stand for the principle that "civil tort actions are not appropriate vehicles for

---

the proposition that there exist "limited circumstances in which [the Supreme] Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, *e.g.*, § 1330 (suits against foreign states), § 1331 (federal question), and § 1332 (diversity)." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005).

In 2005, observing that the *Rooker–Feldman* "doctrine has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases," *Exxon Mobil*, 544 U.S. at 283, the Supreme Court began an effort to narrow the doctrine, first in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, and, most recently in *Skinner v. Switzer*, 131 S. Ct. 1289. As the Supreme Court has now explained, "*Rooker–Feldman* is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers inviting district court review and rejection of the state court's judgments"—i.e., it does not apply to harms somehow related to, but not caused by, state court judgments. *Skinner*, 131 S. Ct. at 1297 (internal quotation marks and alterations omitted) (quoting *Exxon Mobil*, 544 U.S. at 284). *See also generally, e.g.*, *Mikhail v. Kahn*, --- F. Supp. 2d ----, ----, No. 13-5130, 2014 WL 114340, at *5-14 (E.D. Pa. Jan. 13, 2014), *aff'd*, --- F. App'x ----, No. 14-1144, 2014 WL 3309172 (3d Cir. July 9, 2014).

[28] "Claim preclusion, formerly referred to as res judicata," *Bd. of Trustees of Trucking Emps. of N.J. Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992), "generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit," *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Res judicata "requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *Centra*, 983 F.2d at 504; *accord, e.g.*, *R/S Fin. Corp. v. Kovalchick*, 716 A.2d 1228, 1229-30 (Pa. 1998).

challenging the validity of outstanding criminal judgments," *Heck*, 512 U.S. at 486, and the

application of the doctrine is accordingly limited to barring a "§ 1983 action . . . (absent prior

invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of

the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if

success in that action would necessarily demonstrate the invalidity of confinement or its

duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). Because Mr. Collura only challenges

the Probation Officer Defendants' alleged conduct in supervising a portion of his probation, and

not his "confinement or its duration" (or, in the case of a probationer, the probation conditions

"imposed as part of a court judgment," rather than "the discretionary decisions" of probation

officers, *see Thornton v. Brown*, --- F.3d ----, ----, No. 11-56146, 2013 WL 7216368, at *7-8 (9th

Cir. Feb. 18, 2014)), *Heck* is inapplicable here.[29]

Finally, the Court strikes the Defendants' statute of limitations defense. Mr. Collura's

cause of action arises under 42 U.S.C. § 1983, for which courts apply the state statute of

---

[29] *Cf. also, e.g.*, *D'Amario v. Weiner*, No. 12-6098, 2014 WL 1340022, at *4 (D.N.J. Apr. 3, 2014) ("How the Supreme Court's jurisprudence in this area applies when a prisoner challenges the conditions of parole, probation, or supervised release remains unsettled. Although the Third Circuit has not addressed the issue, the Seventh Circuit has held such challenges must be made in a habeas proceeding rather than a civil rights proceeding. . . ." (footnote omitted)).

The *Heck* defense is stricken without prejudice. If Mr. Collura seeks to renew an attack on the court-imposed conditions of his probation, he may well be subject to the defense, which, because it is a defense of failure to state a claim, may be raised *sua sponte*, as a number of courts have noted in passing. *E.g.*, *Hunt v. Michigan*, 482 F. App'x 20, 21 (6th Cir. 2012) (per curiam), *cert. denied*, 133 S. Ct. 1999 (2013); *Roberts v. O'Bannon*, 199 F. App'x 711, 712-13 (10th Cir. 2006); *Whatley v. Coffin*, 496 F. App'x 414, 416 (5th Cir. 2012) (per curiam) ("Whatley was notified of the *Heck*-bar issue and afforded multiple opportunities to contest a dismissal on that ground."); *Frost v. Fox*, 53 F.3d 338, at *1-2 (9th Cir. 1995) (table opinion); *cf. also, e.g.*, *Bintliff-Ritchie v. Am. Reins. Co.*, 285 F. App'x 940, 943 (3d Cir. 2008) ("The District Court has the power to dismiss claims *sua sponte* under Rule 12(b)(6)." (citing *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980))). Further, *Heck* "is not waived by failure to plead it as an affirmative defense." *Walker v. Munsell*, 281 F. App'x 388, 389 (5th Cir. 2008) (per curiam) (state sovereignty–based rationale). Further, as a defense of failure to state a claim, the *Heck* doctrine is properly raised either in a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), or "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." Fed. R. Civ. P. 12(h)(2).

limitations for personal injury claims. *Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998). Pennsylvania's limitations period for such claims runs two years. *Id.*; *see* 42 Pa. Cons. Stat. Ann. § 5524. Mr. Collura brought this action on July 11, 2013. Therefore, all allegations against the Probation Officer Defendants that took place before July 11, 2011 are time-barred by the statute of limitations. All of Mr. Collura's allegations regarding the Probation Officer Defendants, however, occur on or after April 12, 2012, well after July 11, 2011. The Court therefore grants Mr. Collura's Motion to Strike as to the Defendants' statute of limitations defense.

*     *     *

The Court will not strike the Defendants' "affirmative defenses" of failure to state a claim, the contention that the Defendants acted in a reasonable manner, or the contentions that Mr. Collura is not entitled to declaratory and/or injunctive relief or punitive damages. Although none of these arguments are technically "affirmative defenses," their inclusion in the proposed pleading in no way prejudices Mr. Collura. For one, the Federal Rules of Civil Procedure explicitly provide that the defense of failure to state a claim "may be raised . . . in any pleading allowed or ordered under Rule 7(a)." Fed. R. Civ. P. 12(h)(2)(A); *id.* 7(a)(2) (pleadings include "an answer to a complaint"). Although the Defendants have not specified on what grounds they believe Mr. Collura has failed to state a claim, the Court has suggested earlier in this Memorandum Opinion, for example, that Mr. Collura may have failed to state a due process claim because he has not alleged any deprivation of his liberty. Because the defense of failure to state a claim can be raised at any point anyway, and, further, because such defense may, in fact, be appropriate here, the Court will not strike it.

Second, while the contention that Defendants acted in a reasonable manner is, if taken alone, conclusory, the Court finds that, if it credits (as it must, for purposes of the Motion to Strike) the factual allegations in Defendants' Proposed Amended Answer, the contention is relevant to the defense of Mr. Collura's ostensible Fourth Amendment claim that he was unlawfully subjected to urinalysis. It may also be relevant to the Defendants' defense of Mr. Collura's retaliation claims.

Third, Defendants' contention that Mr. Collura is not entitled to declaratory and/or injunctive relief is merely a legal claim about the operation of the Defendants' defenses. If, as they have necessarily argued at the motion-to-set-aside-default stage, the Defendants have raised meritorious defenses to all of Mr. Collura's claims, then it follows, as a matter of logic, that Mr. Collura is entitled to no relief, including declaratory or injunctive relief.

Finally, and for similar reasons, the contention that Mr. Collura is not entitled to punitive damages is sufficient at this stage. Punitive damages are available under § 1983 only where the plaintiff proves that the "defendant's conduct" is, "at a minimum, reckless or callous" in disregarding "the rights or safety of others." *Savarese v. Agriss*, 883 F.2d 1194, 1203-04 (3d Cir. 1989) (following *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The Defendants, of course, have alleged that they have acted reasonably and lawfully as opposed to in reckless or callous indifference to Mr. Collura's constitutional rights, and so this defense, which is really just legal conclusion based on the Defendants' factual allegations, is not improper.

\* \* \*

The Court will also decline to strike several defenses on the ground that doing so is premature and properly awaits some factual development through discovery. First, the Court

declines to strike the Defendants' *Younger* defense.[30] The progression of this case may yet show, as with regard to the *Heck* defense, that *Younger* is inapplicable. But the Court has already discussed the potential application of *Younger* to certain aspects of this case. *See, e.g.*, Mar. 28, 2014 Order 10, 17 & n.6. Additionally, while the issue of whether *Younger* abstention is an affirmative defense (or, relatedly, whether it may be raised *sua sponte* and at any time[31]) is somewhat murky, the Court need and will not plumb the turbid depths of this academic ravine. Whether *Younger* is raised by motion or pleading, Mr. Collura has long been on notice of its possible application here. *See, e.g.*, Mar. 28, 2014 Order 10, 17 & n.6.

Second, the Court cannot properly, and therefore will not, opine at this stage as to whether the Defendants have absolute or qualified immunity. Whether the Probation Officer Defendants are entitled to absolute immunity from Mr. Collura's § 1983 claims depends on whether they "perform[ed] investigative or evaluative functions at a governmental adjudicative entity's request to assist that entity in its decisionmaking process are entitled to absolute immunity." *Williams v. Consovoy*, 453 F.3d 173, 178 (3d Cir. 2006); *see id.* ("[A]bsolute immunity attaches to those who perform functions integral to the judicial process." (citing *Burns v. Reed*, 500 U.S. 478, 484 (1991))). Answering this question requires courts to undertake a "'functional' approach" that considers "the nature of the functions being performed by the actor in question and . . . the effect that exposure to liability would have on an appropriate exercise of

---

[30] *Younger v. Harris*, 401 U.S. 37 (1971); *see also Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2014).

[31] *See Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) ("[A]bstention may be raised by the court Sua sponte."); *see also, e.g.*, *O'Neill v. City of Philadelphia*, 32 F.3d 785, 786 n.1 (3d Cir. 1994) ("Even though the question of *Younger* abstention was not raised by the parties on appeal, we may consider it *sua sponte*."); *Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001); *Rivera-Feliciano v. Acevedo-Vila*, 438 F.3d 50, 59-60 (1st Cir. 2006); *Kingston v. Utah County*, 161 F.3d 17, at *2 (10th Cir. 1998) (table opinion).

that function." *Id.* at 178. The Court will not undertake this inquiry without a proper motion (i.e., not upon a motion to strike) or development of the factual record.

Similarly, under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). What the Probation Officer Defendants (and Mr. Ford, in particular) knew at the time of the alleged events is, of course, in heated dispute. Perhaps more importantly, though, the Fourth Amendment principles applicable in this are less than clear, and "[i]f the law at [the] time [the actions occurred] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

*     *     *

For the reasons described above, the Court grants in part and denies in part Mr. Collura's Motion to Strike (Docket No. 57) without prejudice to the Defendants' raising those defenses should such repleading comply with the guidance above.

### B.     Motion for Judgment on the Pleadings

For the same reasons that the Court has held that the Defendants have raised meritorious defenses, Mr. Collura's Motion for Judgment on the Pleadings (Docket No. 58) must be denied.[32] A court evaluating a motion for judgment on the pleadings "must accept the truth of all factual allegations in the [pleading] and must draw all reasonable inferences in favor of the non-movant." *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). "All factual inferences and

---

[32] *See supra* note 23.

intendments are taken against the moving party . . . and [such a] motion will [not] be granted unless the movant is entitled to judgment as a matter of law." 5C Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 1369 (3d ed. Apr. 2014). As explained above, the Defendants appear to have either legal defenses to Mr. Collura's claims (*e.g.*, Mr. Collura's purported due process claim appears to fail because he has not stated any deprivation of liberty) or defenses based on denials of fact (*e.g.*, the Defendants' different version of events with regard to Mr. Collura's First Amendment retaliation claim).

Notwithstanding his contention to the contrary, Mr. Collura has not, in fact, proven his case, and at this point no one can or does know that what he alleges in his Complaint is, indeed, fact. Because Mr. Collura is the movant, he, like the Court, for purposes of resolving his Motion for Judgment on the Pleadings, must accept the Defendants' version of the facts, under which he cannot prevail. "[N]o judgment can enter without trial in view of the pendency of the first defense which is a general denial." *Dysart v. Remington Rand*, 31 F. Supp. 296, 297 (D. Conn. 1939); *accord* 5C Wright & Miller, *supra*, § 1369. Because there are "material issue[s] of fact to resolve," *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002), Mr. Collura's Motion for Judgment on the Pleadings must be denied.[33]

### C.     Motion for Reconsideration (Docket Nos. 48 & 62)

---

[33] Lest Mr. Collura attempt to take out of context statements in the case law, such as in *Leamer v. Fauver*, 288 F.3d 532, that "the facts alleged in the pleadings and the inferences to be drawn from those facts [must be read] in the light most favorable to the *plaintiff*," *id.* at 535 (emphasis added), the Court notes the following: The standard for adjudicating a motion for judgment on the pleadings *requires* the court to accept the *nonmovant's* version of the facts and draw all reasonable inferences in favor of the *nonmovant*. Mr. Collura's Motion is something of a hen's tooth; usually defendants, rather than plaintiffs, are the movants and, consequently, the language of most opinions reflects that more typical posture. Here, Mr. Collura is the movant and his opponents are the nonmovants.

Upon consideration of Mr. Collura's Motion for Reconsideration (Docket No. 48), the

Defendants' Responses (Docket Nos. 53 & 54), and Mr. Collura's "Reply to March 28th, Filing"

(Docket No. 62), which the Court construes as an addendum to Mr. Collura's Motion for

Reconsideration, the Court will deny Mr. Collura's Motion for Reconsideration.

A motion for reconsideration "must rely on one of three grounds: (1) an intervening

change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear

error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir.

2010) (per curiam); *accord Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669,

677 (3d Cir. 1999). To be sure, Mr. Collura contends that this Court has erred in many respects,

but his motion fails because it does not meet the basic requirements for reconsideration.

Primarily, Mr. Collura continues his attempts to relitigate the Court's rulings under the

default/default judgment standard with regard to the Probation Officer Defendants. Mr. Collura's

contention that he has established prejudice sufficient to prevent the setting aside of default

based on his conclusory assertions of "loss of evidence, an increased potential for fraud or

collusion, substantial reliance on the entry of default, and other substantial factors," as well as

the assertions that "he now does not have enough funds to prosecute this case on merits, also

health issues, it's flu season . . . the lack of funds and health issues, would interfere all the time

and work, attending hearings, conducting discovery (everyone of them would get deposed

extensively), trials, appeals, etc.," Mot. Reconsider. 0-1, is insufficient. *See, e.g.*, *Sourcecorp*,

412 F. App'x at 460 ("[T]he costs associated with continued litigation normally cannot constitute

prejudice."); *Feliciano*, 691 F.2d at 656-57 ("[D]elay in realizing satisfaction on a claim rarely

serves to establish [a sufficient] degree of prejudice."); *Kelly M.*, 71 F. App'x at 118 ("[T]he

emotional strain of litigating an action on the merits is not the kind of prejudice towards which

our jurisprudence is directed."); *supra* Part II.

Second, Mr. Collura contends that the Probation Officer Defendants did not establish that their default was not willful. The Court disagrees and reconfirms its initial determination that their default was the result of negligent administrative error. "[T]here is nothing in the record indicating that the defendants' conduct went beyond mere negligence, rising to the level of 'flagrant bad faith' or 'contumacious behavior.'" *Jorden v. Nat'l Guard Bureau*, 877 F.2d 245, 251 (3d Cir. 1989) (citing *Emcasco*, 834 F.2d at 75; *Scarborough v. Eubanks*, 747 F.2d 871, 875 (3d Cir. 1984)).

Third, Mr. Collura argues that "a defense" for purposes of the default judgment standard "strictly involves the complaint being true." Mot. Reconsider. 3. While Mr. Collura has defined the concept of an "affirmative defense," here the focus must be on an understanding of the term "meritorious defense," which, for purposes of the default judgment standard, as set out above, is *any* defense, not simply an "affirmative defense." *See supra* note 10 and accompanying text. Furthermore, Mr. Collura misunderstands footnote 8 of the Court's prior Order, which states that "[t]he Court will not address Mr. Collura's supplemental state law claims at this juncture, because if the Defendants were to establish meritorious defenses to the federal claims, the Court would likely have to decline to exercise supplemental jurisdiction over the state law claims," Mar. 28, 2014 Order 18 n.8, and refers to footnote 2, which states:

> These [state law] claims are not relevant at this juncture (considering whether to lift default judgment), because if the Probation Officer Defendants establish complete defenses to Mr. Collura's federal claims, the Court will likely lose jurisdiction over Mr. Collura's Pennsylvania law–based claims. "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must decline* to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added); *accord United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *see also, e.g.*, *Shaffer v. Bd. of Sch. Dirs.*, 730 F.2d 910, 912 (3d Cir. 1984) ("[P]endent jurisdiction should be declined where the federal claims are no longer viable,

> absent extraordinary circumstances." (citations and internal quotation marks
> omitted)).

Mar. 28, 2014 Order 2 n.2. A sensible reading of these footnotes, and certainly what the Court

intended to convey, is that if, at a later stage of the litigation, the Probation Officer Defendants

"*establish* complete defenses to Mr. Collura's federal claims" so that those federal claims *are*

*dismissed* or judgment is granted on them in the Defendants' favor, *then* the Court will likely

have to decline to exercise supplemental jurisdiction over Mr. Collura's remaining state law

claims. This ruling should not be misunderstood to mean that "the state claims [will] be

dropped," Mot. Reconsider. 3, simply if the Court sets aside the entry of default. Those claims

will proceed as well.[34]

*   *   *

Mr. Collura also seeks to relitigate his claims against Judge Dembe and the City of

Philadelphia, but the Court has already adjudicated these matters at least twice and will not do so

again. *See* Reply to March 28th, Filing 3-6, 8-11 (claims against Judge Dembe); *id.* at 7-8

(claims against the City); Oct. 15, 2013 Order (Docket No. 8) (reconsideration denied); Mar. 28,

2014 Order (Docket No. 47) (reconsideration denied).

To the extent that Mr. Collura argues that his Complaint also alleged "claims that involve

FJD practices and polic[i]es, whether or not it allegedly mistakenly says the City is liable for

FJD, it still pleads FJD illegal policies, practices, customs," Reply to March 28th, Filing 6, the

Court observes that 42 U.S.C. § 1983 claims of unconstitutional policies, practices, or customs

under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), cannot be brought against

states or their subdivisions. The Supreme Court has always "limited" *Monell*'s reach "to local

government units which are not considered part of the State for Eleventh Amendment purposes,"

---

[34] The Court does note that the Defendants have raised other defenses to Mr. Collura's state
law claims. Defs.' Supp. Br. 19-22 (Docket No. 41).

*id.* at 691 n.54. By contrast, "[s]uits against state officials in their official capacity . . . should be treated as suits against the State," *Hafer v. Melo*, 502 U.S. 21, 25 (1991), such that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" due to their Eleventh Amendment immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (plurality opinion). The First Judicial District, of course, as an "integral component" of "a unified state judicial system . . . has Eleventh Amendment immunity." *Benn v. First Judicial Dist.*, 426 F.3d 233, 240-41 (3d Cir. 2005). Consequently, Mr. Collura's attempted attack on the "FJD" cannot proceed as a matter of law.

*     *     *

Mr. Collura's general attacks on the Court, including his contention that the Court is "conducting private litigation with Plaintiff while the offenders sit on the sideline," Reply to March 28th, Filing 12, and threats of another recusal motion and his intention to sue the Court, are unwarranted, not to mention inappropriate—even for a layperson who feels unconstrained by professional obligations.

First, Mr. Collura is mistaken that "[t]he [Order] requesting court documents that imposed or indicated Plaintiff's sentence should be vacated immediately. It is a wholly frivolous request . . . ." Mot. Reconsider. 4. As the Court indicated in the March 28, 2014 Order, and again has observed in this Memorandum, the conditions of Mr. Collura's probation may well be relevant—including, for instance, to his ostensible Fourth Amendment claim that he should not have been subjected to urinalysis. In fact, Mr. Collura's own arguments in this litigation belie this contention: elsewhere, Mr. Collura contends that because the sentencing court's order did not impose drug tests, the tests were unlawful. *See supra* Section III.C; note 13 and accompanying text. Either the information is relevant to proving his claim, in which case it may

59

also be relevant to the Defendants' defense, or it is not. Mr. Collura cannot have it both ways. In any case, the Court finds the information germane.

Furthermore, the Defendants have hardly been "sit[ting] on the sideline," as a review of the docket shows. Moreover, Federal Rule of Civil Procedure 55 permits the Court to "establish the truth of any allegation by evidence" and "investigate any other matter" upon a motion for default judgment. Fed. R. Civ. P. 55(b)(2)(C) & (D). By requiring the Defendants to submit evidentiary support for their factual allegations in their Proposed Answer and the defenses they briefed, the Court was hewing closely to the applicable standard of review. And requiring the Defendants to "attach[] any other necessary and/or helpful documentation," Mar. 28, 2014 Order 19, does not usurp trial counsel's role or render the Court partial; rather, it indicates, once again, that the Defendants have a burden to meet and permits them to attempt to do so.

Mr. Collura's Motion for Reconsideration also raises the specter of "another recusal motion" and argues that the Probation Officer Defendants "are going to get the most ultra biased and bogus defenses." Mot. Reconsider. 4-5. Several bases for recusal are enumerated under 28 U.S.C. § 455. Most pertinent to Mr. Collura's allegations appears to be § 455(a), under which the judge must recuse himself if "a reasonable person, with knowledge of all facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.,* 368 F.3d 289, 301 (3d Cir. 2004). Additionally, "§ 455(b) lists specific circumstances under which a judge 'shall also disqualify himself.' One such provision, § 455(b)(1), requires recusal where a judge 'has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.' 28 U.S.C. § 455(b)(1)." Mar. 1, 2013 Order 3, *Collura v. City of Philadelphia*, No. 12-4398 (E.D. Pa.) (ECF No. 52), *referenced in* 2013 WL 3952522, at *2 (Aug. 1, 2013). No other provisions of § 455 seem even arguably applicable here.

As the Supreme Court has explained,

judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky v. United States*, 510 U.S. 540, 555 (1994) (citation omitted); *accord, e.g.*, *In re Dougherty*, 393 F. App'x 843, 844-45 (3d Cir. 2010) (per curiam).

What Mr. Collura alleges against the Court here cannot possibly meet that standard. He is, as his numerous motions for reconsideration (Docket Nos. 7, 38, 43, 48) indicate, dissatisfied with this Court's rulings. Further, his argument that the Court has shown bias because it denied his Motion to Strike but did not deny the Defendants' Proposed Answer is misplaced. *See* Mot. Reconsider. 5. When the Court denied Mr. Collura's Motion to Strike as premature, it noted that the Motion was premature given that "[t]he Defendants have not in fact filed an Answer because the Court, as stated above, has not ruled on their Petition for Leave to File Answer," and that "[i]f and when the Court grants the Petition for Leave to File Answer, and the Defendants in fact file an Answer, Mr. Collura may refile this motion or a renewed version thereof." Feb. 10, 2014 Order ¶ 3 (Docket No. 37). By contrast, the Defendants had to be able to file their Proposed Answer and Amended Proposed Answer in order properly to move for the default to be set aside—that much is abundantly clear from the standard for setting aside defaults and default judgments, as set forth above, because the Court must examine, inter alia, a defendant's *allegations* to determine whether he has a meritorious defense.

It is an inescapable conclusion from Mr. Collura's filings that he is distrustful of federal judges generally.[35] But Mr. Collura's willingness to disagree with almost every ruling of this Court does not mean that he can establish any basis for recusal. "Adverse rulings, without more, are insufficient to warrant recusal under 28 U.S.C. § 455." *Dougherty*, 393 F. App'x at 845.

\* \* \*

Finally, the Court finds that it did not sanction Mr. Collura in its February 10, 2014 Order. The relevant paragraph of the February 10, 2014 Order states:

> **Mr. Collura IS ADMONISHED for his discourteous language in several of his filings with this Court and warned that disrespectful language in future filings may be stricken on the Court's own motion.** *See* FED. R. CIV. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The Court may act: (1) on its own . . . ."). ***Ad hominem* and other impertinent and unwarranted attacks on litigants and their counsel—as well as this Court—will not be tolerated.**

Feb. 10, 2014 Order ¶ 6 (Docket No. 37) (footnotes omitted).

Mr. Collura claims that "[s]anctions may include warnings, oral reprimands, or **written admonitions**." Reply to March 28th, Filing 14-15 (citing *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987)). Mr. Collura is correct that sanctions can be levied by written admonition. But some version of the converse—that every written admonition is a sanction—does not follow. To the contrary, "most courts agree that mere judicial criticism is insufficient to constitute a

---

[35] "Whatever a robeowner can do to be rotten," Mr. Collura asserts, "they will." Mot. Reconsider. 4; Reply 7-8 (Docket No. 64) ("I'll file a hundred suits if I want, nobody is going to [do] anything about it but commit more judicial and attorney misconduct, continue to damage their own reputation in the profession, all of which is going to lead to even more litigation."); Fourth Opp. 29 (Docket No. 56) ("Just because a robeowner yet again violates the constitution and other things by attempting to adopt it does not do anything."); *cf. also, e.g., Collura v. White*, No. 12-4398, 2013 WL 6022141, at *7 (E.D. Pa. Nov. 14, 2013) ("Plaintiff has attempted to derail every stage of this litigation. Rather than focusing on the merits of his case, plaintiff continues to file motion after motion contesting this Court's jurisdiction, seeking recusal, demanding remand to state court, and attempting to postpone and/or stay court proceedings, despite that this Court and the U.S. Court of Appeals for the Third Circuit consistently have denied his duplicative requests.").

sanction." *Bowers v. NCAA*, 475 F.3d 524, 543 (3d Cir. 2007). Courts have "decline[d] to

find . . . that any time a court includes critical words about an attorney's conduct in an order,

those words constitute a formal reprimand." *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1199

(9th Cir. 1999). As the First Circuit Court of Appeals has explained,

> a jurist's derogatory comments about a lawyer's conduct, without more, do not
> constitute a sanction. A trial judge has the obligation to assure the proper conduct
> of proceedings in his or her court, *see Quercia v. United States*, 289 U.S. 466, 469
> (1933); *United States v. Polito*, 856 F.2d 414, 418 (1st Cir. 1988), and must retain
> the power to comment, sternly when necessary, on a lawyer's performance
> without wondering whether those comments will provoke an appeal.

*In re Williams*, 156 F.3d 86, 92 (1st Cir. 1998).

It is also true that "courts are in near complete agreement that an order rising to the level

of a public reprimand is a sanction." *Bowers*, 475 F.3d at 543. *But see Clark Equip. Co. v. Lift

Parts Mfg. Co. Inc.*, 972 F.2d 817, 820 (7th Cir. 1992) ("[A]n attorney may not appeal from an

order that finds misconduct but does not result in monetary liability, despite the potential

reputational effects."). "The reason for the courts' consensus is that a public reprimand carries

with it the formal censure of the court and may, in many cases, have more of an adverse effect

upon an attorney than a minimal monetary sanction." *Bowers*, 475 F.3d at 543. But the fact that

"[w]ords alone *may* suffice if they are expressly identified as a reprimand," *Williams*, 156 F.3d at

92 (emphasis added), does not mean that they always do suffice.

This Court "nowhere suggested that [its] comments regarding [Mr. Collura] were meant

as a formal sanction." *In re Vebeliunas*, 246 B.R. 172, 174 (S.D.N.Y. 2000). The Court stated

that it was "warn[ing Mr. Collura] that disrespectful language in future filings may be stricken on

the Court's own motion" because "discourteous language," such as that which he had

undisputably employed, including "[*a*]*d hominem* and other impertinent and unwarranted

attacks . . . will not be tolerated." Feb. 10, 2014 Order ¶ 6. The Court's "comments served to

explain why the court concluded that it was necessary" to warn Mr. Collura regarding his use of inappropriate language. *Weissman*, 179 F.3d at 1200. The Third Circuit Court of Appeals has not explored these issues in depth. *See Bowers*, 475 F.3d at 543-44 ("We need not examine that dichotomy in great detail in this case because both the order and opinion issued by the District Court in this case explicitly stated that the Court was sanctioning not only Bowers but also her attorneys."). But it is also abundantly clear that the Court's directive to Mr. Collura to use appropriate language was not "the repeated, explicit public reprimand [that] constitutes an appealable sanction." *Id.* at 544.

Moreover, it is clear that an order must "r[i]se above mere judicial criticism" or courtroom administration. *Bowers*, 475 F.3d at 543 (citing *United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000)). "A reprimand generally carries with it a degree of formality." *Talao*, 222 F.3d at 1138. Indeed, "[r]eprimand . . . means to reprove severely," *id.* (citing *Fed. Labor Union 23393 v. Am. Can Co.*, 100 A.2d 693, 695 (N.J. Super. Ct. 1953), not "to speak to (someone) in a way that expresses disapproval or criticism," "to tell or urge (someone) to do something," "to indicate duties or obligations to," "to express warning or disapproval to especially in a *gentle, earnest, or solicitous manner*," or "to give friendly earnest advice or encouragement to"—the definitions of "admonish," *Merriam-Webster*, http://www.merriam-webster.com/dictionary/admonish (emphasis added)—especially when the same sentence refers to the Court's action of "warn[ing]" Mr. Collura in conjunction with directing him to cease using offensive language.

Finally, the Court is unaware of case law, binding or persuasive (and Mr. Collura has cited none) that would suggest that the rationale for holding "a trial court's reprimand of a lawyer is immediately appealable, even though the court has not also imposed monetary or other sanctions upon the lawyer," *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346,

1352 (Fed. Cir. 2003), would apply to a nonattorney pro se litigant. The rule respecting attorneys "reflects the seriously adverse effect a judicial reprimand is likely to have upon a *lawyer's* reputation and status in the community and upon his career." *Id.* (emphasis added); *see also, e.g.*, *United States v. Rivera*, 613 F.3d 1046, 1052 (11th Cir. 2010) ("The Fifth Circuit, aware of its duty to assure that lawyers, as officers of the court, live up to their ethical responsibilities, exercised jurisdiction solely to review a finding of fact because of the importance of an attorney's professional reputation." (citations and internal quotation marks omitted)); *Walker v. City of Mesquite*, 129 F.3d 831, 832-33 (5th Cir. 1997) ("Peebles was reprimanded sternly and found guilty of blatant misconduct. That reprimand must be seen as a blot on Peebles' professional record with a potential to limit his advancement in governmental service and impair his entering into otherwise inviting private practice."). A nonattorney pro se litigant has little interest in his reputation as a litigator, and mere "injury to reputation" cannot be "the guiding precept," for if it were, "there [would be]no principled basis for distinguishing between a chastised attorney and any other participant in the judicial process who becomes the target of the presiding judge's opprobrium." *Williams*, 156 F.3d at 91; *see also, e.g.*, *Bolte v. Home Ins. Co.*, 744 F.2d 572, 573 (7th Cir. 1984) (rejecting a rule under which "[l]awyers, witnesses, victorious parties, victims, bystanders—all who might be subject to critical comments by a district judge— could appeal their slight if they could show it might lead to a tangible consequence such as a loss of income."); *cf. also, e.g.*, *Weissman*, 179 F.3d at 1197 ("A vexatious litigant order imposed against a pro se litigant, however, is distinguishable from an order that limits an attorney's right to file pleadings on behalf of a client, *i.e.*, to practice his or her profession."). It is quite likely for this reason that "even the broadest understanding of what constitutes an appealable sanction *requires a finding of* [*professional*] *misconduct*." *Teaford v. Ford Motor Co.*, 338 F.3d 1179, 1182-83 (10th Cir. 2003) (emphasis added). Mr. Collura obviously is no professional, and the

Court implied no such misconduct vis-à-vis Mr. Collura's only garden-variety, if morbidly creative, name-calling. Thus, the Court's directive does not "bear[] a greater resemblance to a reprimand than a comment that is merely critical of [Mr. Collura's] behavior," *Adams v. Ford Motor Co.*, 653 F.3d 299, 306 (3d Cir. 2011). The Order contains no statement or other finding that Mr. Collura has violated a canon or code of professional conduct such as to constitute an "affront" to Mr. Collura's (nonexistent) professional reputation as a lawyer, *id.*[36]

### D. Motion to Strike (Docket No. 59)

Upon consideration of Mr. Collura's "Motion to Strike and Destroy Scandalous, Impertinent, Erroneous, Material" ("Motion to Strike" Docket No. 59) (which is based on the false premise that the filing in question had been filed publicly on the docket in this case), Defendants' Response thereto (Docket No. 60), and Mr. Collura's Reply (Docket No. 64), the Court will deny Mr. Collura's Motion to Strike for the following reasons.

Contrary to Mr. Collura's expressed understanding, the Probation Officer Defendants' Supplemental Submission in Support of Their Motion to Set Aside the Clerk of Court's Entry of Default and Amended Proposed Answer (Docket No. 50) has always been under seal, and *not accessible to the public*. The Supplemental Submission was submitted on Friday, April 11, 2014. The Clerk of Court thereafter noted on the docket—on Monday, April 14, 2014—that such a motion had been received in court and "FILED UNDER SEAL." The Court then confirmed by its April 14, 2014 Order (Docket No. 51) that the Supplemental Submission was, indeed, to be

---

[36] *Accord State v. Perez*, 885 A.2d 178, 189 (Conn. 2005) ("[A]lthough the Appellate Court's statements criticizing the plaintiff were pointed and strong, those statements did not purport to represent a finding that the plaintiff had violated the Rules of Professional Conduct. Therefore, they reasonably cannot be characterized as a reprimand or other sanction." (footnote omitted)); *cf. also, e.g.*, *Keach v. County of Schenectady*, 593 F.3d 218, 225 (2d Cir. 2010) ("[T]he district court here did not make findings of violations of specific professional standards, refer the matter to disciplinary authorities, issue a reprimand, or declare that Keach was guilty of misconduct. . . .").

filed under seal. The public has never had access to the Supplemental Submission, nor is there any plan to "release[ it] to the public." Mot. Strike 1.

Mr. Collura's other arguments must also be rejected. Mr. Collura has put a number of facts, including his mental health, at issue with this lawsuit because, perhaps most importantly, he was apparently assigned to the Mental Health Unit. Thus, he cannot now argue that the Probation Officer Defendants' service of the Supplemental Submission and its exhibits on Martha Gale, the Administrative Office of Pennsylvania Courts lawyer for former Defendant (and Judge) Pamela Pryor Dembe, violated the Health Insurance and Portability Act of 1996, Pub. L. No. 104-191. Further, his arguments that "[i]t makes no difference whether or not [he] has a valid conviction," Mot. Strike 1, or that "it makes no difference whether or not [he] was correctly assigned to [the Mental Health U]nit," *id.*, are thus without merit. For substantially the reasons described in the Memorandum also issued today regarding whether the default should be lifted, the terms and conditions of Mr. Collura's probation and the circumstances of his interactions with the Probation Officer Defendants are indeed relevant. *See supra* Section III.C. To the extent that Mr. Collura seeks to contest the accuracy of the contents of the Exhibits attached to the Defendants' Supplemental Submission, *see* Mot. Strike at 4-8, he may do so through discovery as this litigation progresses. At this early stage of the litigation, the facts are in dispute rather than truths "know[n] to be fact," as Mr. Collura contends. Mot. Strike 5.

### E.      Motion to Disqualify (Docket No. 61)

Upon consideration of Mr. Collura's "Motion to Invoke Judicial Estoppel [to] Disqualify Archer and Greiner" ("Motion to Disqualify," Docket No. 61), Defendants' Response thereto (Docket No. 63), and Mr. Collura's Reply (Docket No. 66), the Court will deny Mr. Collura's

Motion to Disqualify as an unwarranted attempted third bite at the apple, under both the reconsideration standard and de novo.

As Defendants point out, Mr. Collura has tried to disqualify their counsel twice before. *See* "Plaintiff's Motion to Disqualify/Oppose Entry of Appearance by Oleg W. Nudelman, Jeffrey Scott, Archer and Greiner" (Docket No. 36); "Plaintiff's Motion to Disqualify Archer and Greiner" (Docket No. 45). These efforts were denied. Feb. 10, 2014 Order ¶ 5 (Docket No. 37); Mar. 28, 2014 Order 14-15, 19 (Docket No. 47).

Mr. Collura now argues that Archer and Greiner, counsel for the remaining Probation Officer Defendants, must be disqualified because

> [t]hey refused to accept service for [the Probation Officer Defendants], and refused to provide legal counsel, both on the basis that the [First Judicial District] is a completely separate entity that they have absolutely no involvement in. Instead the hired the above only for themselves, who in turn declared under oath as officers of the court, over and actions, behavior, from then turning right around and hiring counsel for what they just declared repeatedly was **not their employees**, was a completely **separate entity with no connection**. Again, Archer and Griener [sic] must be disqualified immediately.

Mot. Disqualify 1-2.

Mr. Collura already raised this argument, albeit more concisely, in "Plaintiff's Motion to Disqualify Archer and Greiner" (Docket No. 45). It would be enough here simply to observe that Mr. Collura has offered nothing to meet the motion for reconsideration standard outlined already above. *See generally, e.g.*, *Quinteros*, 176 F.3d at 677.

Despite the sufficiency of denial under the motion for reconsideration standard, the Court will attempt to explain one last time why the instant Motion must be denied.

Mr. Collura appears to contend that because, as in this case, "[t]he City of Philadelphia Law Department provides legal representation to First Judicial District employees upon request," Decl. of Jeffrey M. Scott ¶ 4.c, Docket No. 41, Ex. B, and because "the City was served on July

22nd," Mot. Invoke 1, the City's refusal to accept service for the Probation Officer Defendants on the basis that the Probation Officer Defendants were not City employees now preclude the City, by hiring Archer and Greiner, from representing the Probation Officer Defendants (and therefore treating the Probation Officer Defendants as City employees). Further, Mr. Collura observes, the Court "somehow [in] a prior filing declared that the City did not hire **them for First Judicial District**." Mot. Invoke 0. And, Mr. Collura concludes, judicial estoppel bars the City from making conflicting arguments. *See* Mot. Disqualify 1 n.1 (Docket No. 45).

Mr. Collura is correct that the Court inadvertently misstated in its March 28, 2014 Order that "there is no indication that it is the City that is hiring Archer and Greiner for the Probation Officer Defendants." Mar. 28 Order 15 (Docket No. 47). In fact, the office of Dominic J. Rossi, Deputy Court Administrator for the First Judicial District, "forwarded the summons and complaint to Elizabeth Mattioni, the Litigation Chair for the City of Philadelphia Law Department, via email, requesting legal representation for Defendants Nicholas Ford, Mary Politano, Steffen Boyd, Steven Austin, Deputy Chief Charles Hoyt and Chief Robert Malvesuto." Scott Decl. ¶ 4.f. (Notably, Mr. Collura never pointed to these statements in his original motion to disqualify. *See* Mot. Disqualify (Docket No. 45)). The language from the Court's March 28, 2014 Order might properly have read, for instance, that "there is no indication that the City had hired Archer and Greiner for the Probation Officer Defendants before the Probation Officer Defendants were served, or, even if it had, that either the City or Archer and Greiner had any legal duty to accept service on behalf of the Probation Officer Defendants."

None of this, however, changes the force of the Court's reasoning and the result it reached. As Mr. Scott's Declaration establishes, "[t]he City of Philadelphia Law Department provides legal representation to First Judicial District employees upon request." Scott Decl. ¶ 4.c. But the fact that the City has procured Archer and Greiner's representation for the Probation

Officer Defendants does not mean that the Probation Officer Defendants are City employees or

that on July 22, 2013, as counsel for the City, Archer and Greiner was obligated to accept service

for the Probation Officer Defendants. As the Court explained earlier, the First Judicial District

and *its* employees do not answer to the City of Philadelphia. Rather, as a matter of Pennsylvania

constitutional law, the First Judicial District is a creature of the Commonwealth of Pennsylvania.

As another Eastern District of Pennsylvania court observed in *Scott v. Yates*, No. 00-5024, 2001

WL 1636309 (E.D. Pa. Dec. 20, 2001):

> The Pennsylvania Constitution provides:
>
>> The judicial power of the Commonwealth shall be vested in a
>> unified judicial system consisting of the Supreme Court, the
>> Superior Court, the Commonwealth Court, courts of common
>> pleas, community courts, municipal and traffic courts in the City of
>> Philadelphia, and such other courts as may be provided by law and
>> justices of the peace. All courts and justices of the peace and their
>> jurisdiction shall be in this unified judicial system.
>
> Pa. Const. art. V, § 1. The counties are required by state law to provide goods,
> services, and accommodations for the courts within their judicial districts, and
> must pay the salaries of judges and support personnel. See 42 Pa. C.S.A. §§ 3544,
> 3722. Nevertheless, all agencies of the unified state judicial system are part of the
> Commonwealth government and thus are state rather than local agencies. *See
> Callahan v. City of Philadelphia*, 207 F.3d 668, 672 (3d Cir. 1999) (holding
> Warrant Division of First Judicial District is part of unified state judicial system
> and distinct from City).

*Scott*, 2001 WL 1636309, at *2 (E.D. Pa. Dec. 20, 2001) (footnotes omitted).

> Indeed, the Pennsylvania statute states, in full:
>
>> Except as otherwise provided by statute, each county shall continue to furnish to
>> the court of common pleas and community court embracing the county, to the
>> minor judiciary established for the county *and to all personnel of the system*,
>> including central staff entitled thereto, located within the county, all necessary
>> accommodations, goods and services which by law have heretofore been
>> furnished by the county.

42 Pa. Cons. Stat. Ann. § 3722. As the Supreme Court of Pennsylvania has noted, the "goods and

services" that counties must provide to the courts and court personnel include legal services.

*Commonwealth ex rel. Jiuliante v. County of Erie*, 657 A.2d 1245, 1249 (Pa. 1995). And, as

*Scott* explains, counties (such as Philadelphia, which is "a First Class County," *Callahan*, 207 F.3d at 671 n.2) must provide services to the Commonwealth courts located within their districts, and that obligation does not morph a Commonwealth court into a creature of the county in which the court sits.

Thus, Archer and Greiner's actions and contentions are not at all inconsistent. Mr. Scott's statement that "[t]he City of Philadelphia Law Department provides legal representation to First Judicial District employees upon request" is not a statement that the City of Philadelphia Law Department is obligated to accept service on behalf of First Judicial District employees, nor is it a statement that the Probation Officer Defendants are City employees. Moreover, the exhibits tendered here establish that the Probation Officer Defendants requested legal representation from the City (consistent, as described above, not with an employment relationship, but rather with a narrow obligation imposed by Pennsylvania law on the City of Philadelphia) after they were properly served—on November 7, 2013, rather than on July 22, 2013, when, in Mr. Collura's view, the City improperly refused to accept service on behalf of the Probation Officer Defendants.

For the foregoing reasons, there is no basis for Mr. Collura's argument that Archer and Greiner must be disqualified as counsel for the Probation Officer Defendants.

### F.      Motion for ECF Account (Docket No. 39)

Upon consideration of Mr. Collura's Motion for ECF Account (Docket No. 39) and his various filings in this case, the Court will deny Mr. Collura's Motion for ECF Account because Mr. Collura has proved unable to limit his filings to "respectful and appropriate language." Mar. 28, 2014 Order 19. To the contrary, Mr. Collura continues to hurl vitriol at lawyers, litigants, a

lawyer no longer involved in the case (Mark Maguire), and the Court[37] and court personnel, even

after his basis for doing so, in certain instances, has been rejected by the Third Circuit Court of

Appeals.[38] In the Court's view, granting Mr. Collura the privilege to have an ECF account would

improperly suggest acceptance, if not approval, of Mr. Collura's disrespectful litigation tactics

and facilitate his apparent "attempt[] to derail every stage of this litigation" by, "[r]ather than

focusing on the merits of his case, . . . continu[ing] to file motion after motion" on collateral

issues. *Collura v. White*, No. 12-4398, 2013 WL 6022141, at *7 (E.D. Pa. Nov. 14, 2013).

---

[37] *See, e.g.*, Reply 0 (Docket No. 64) ("Oleg Nudelman should be disbarred, should not be practicing law anywhere including here."); Reply to March 28th, Filing 2 (Docket No. 62) ("There is going to be formal complaints, a writ, among others already listed, Justice Ginsburg is going to get a book on you, complete with every openly biased and absurd action and word."); Reply to March 28th, Filing 13 (Docket No. 62) ("You have done anything but adjudicate anything in the past 36 months in accordance with any proper law or procedure, just the opposite."); Reply to March 28th, Filing 3 (Docket No. 62) ("WHY ARE YOU SO OUT OF CONTROL YOU THINK YOU CAN DO ANYTHING YOU WANT?"); Reply to March 28th, Filing 16 (Docket No. 62) ("[D]id I mention again [that Boyd] lied in a previous case—oh I guess I just did. I'll make a note to bring it up ten more times in every filing now."); Fourth Opp. 27 (Docket No. 56) ("Ford, is similar to a sociopath, he doesn't understand the gravity of his offenses, he can violate somebody's rights a ten-thousand times, and in his mind it is okay. Ford has other severe mental disorders includinglike, [sic] Nudelman delusion, pathological lying, other personality disorders. Like Nudelman, Ford needs intensive treatment."); Fourth Opposition 20 (Docket No. 56) ("Plaintiff realizes no ethics Nudleman, like what he calls his client, has severe mental issues."); Notice of Extension of Time to Respond 1 ("I do hereby certify that service of a true and correct copy of the above motion has been served upon the following lowlifes via CM/ECF.").

[38] Mr. Collura continues to attempt to compare Mr. Nudelman's conduct to that of Mr. Maguire. *See, e.g.*, Reply 0 (Docket No. 64) ("One outright lie, false statement of material fact after another after another, Mark Maguire Jr."); Reply 8 (Docket No. 64) ("Once again, like Maguire, he showed his moral bankruptcy and yet again went far beyond the boundaries of acceptable advocacy."); Fourth Opposition 22 (Docket No. 56) ("Totally asinine again, Mark Maguire Jr. Yet another clear sign needs intensive treatment.").

Of course, Mr. Collura appears to be avoiding the Third Circuit Court of Appeals' recent decision in another of his cases. *Collura v. Maguire*, --- F. App'x ----, No. 13-3857, 2014 WL 2766760, at *1-2 (3d Cir. June 19, 2014) ("Collura's complaint does not allege facts that would show that there was a causal link between the filing of the lawsuits and Maguire's misstatements. . . . We also agree, for substantially the reasons set forth in the District Court's decision, that Collura failed to state a claim against Maguire for a violation of his constitutional rights based on injury to his reputation or for violations of his rights to equal protection or due process.").

## V. CONCLUSION

For the foregoing reasons, the Court lifts the Clerk of Court's entry of the Probation Officer Defendants' default and denies Mr. Collura's Motion for Default Judgment and Motion for Judgment on the Pleadings. Additionally, the Court grants in part and denies in part Mr. Collura's Motion to Strike by striking several of the Defendants' proposed affirmative defenses. Finally, the Court denies Mr. Collura's motions seeking reconsideration, disqualification of opposing counsel, the striking of sealed defense exhibits, and an ECF account, and recusal.

An Order consistent with this Memorandum and a Scheduling Order follow.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge